REUBEN SKINNER, *Appellant,*

*against*

ABRAHAM DAYTON, REUBEN WHEELER, WILLIAM RAYMOND, Jun., NATHAN H. RAYMOND, *and the Executors of* ABNER P. HITCHCOCK, deceased, *the Executors of* IRA HALL, deceased, and NATHAN DOANE, JOHN WHITE, RANDOLPH TAYLOR, and MARVIN WHITE, *Respondents.*

APPEAL from the Court of Chancery. The bill filed the 28th of *September*, 1816, stated, that *A. Dayton, R. Wheeler, W. Raymond,* Jun., *Nathan H. Raymond, A. S. Hitchcock, Ira Hall,* and *N. Doane,* being desirous of associating themselves together, for the purpose of manufacturing cotton yarn and cloth, on the 10th of *April,* 1815, adopted and subscribed written articles, called the constitution, declaring, among other things, the name of the association, among other things, the name of the as-

*One partner, or member of an association, cannot execute a deed or writing under seal, so as to bind the others, without an express authority for that purpose; and if he does so, he makes himself personally responsible.* But such authority may be by *parol,* and if shown, or if the other partners or associates, have, by their subsequent assent or acts, ratified the contract, they will be equally responsible, and bound to *contribute,* rateably, to any damages which may be recovered at law, against the partner who executed the contract.

*S.* and others formed an association for manufacturing cotton, &c. and executed articles of agreement, as to the organization of the company, and the mode of managing and conducting its business, &c. The stock of the company was divided into twenty shares, and the subscribers to the stock elected a president, and two of their members as *director,* a *treasurer,* &c. *S.* having been elected president of the company, and *R.* & *H. directors,* on the 25th April, of 1815, they entered into a contract with *W., T.* and *W.,* who had subscribed for two shares of the stock, to make certain machinery, in one year, at a certain price, to be paid in instalments, which contract was signed and sealed by *S.* as " for the directors" of the company. On the 1st of *August* following *R.* and *H.* as directors gave notice to *W. T.* and *W.* that the company could not go on, and that the contract was abandoned ; and *W T.* and *W.* thereupon (the covenants being independent) brought a suit at law against *S.* on the covenant to recover the instalments which fell due before the 1st of August: though the machinery had not been completed or delivered ) *S.* pleaded in bar, that he executed the contract in behalf of the company and in his capacity of *director* and *agent* of the company, and not otherwise ; and the Court, on demurrer, gave judgment against *S.* for want of an averment in his plea of an *authority* from the company to execute the contract ; *Held,* that this decision was not conclusive as to the question of the personal responsibility of *S.* on the contract ; and he having, afterwards, filed a bill in equity against *W., T.* and *W.,* and the other members of the company, and obtained an injunction as to the suit at law which was, afterwards, dissolved by the Chancellor, on the coming in of the answer, on the ground that *S.* was individually and solely responsible ; and this court having reversed that decree, directed the Court of Chancery, by a reference to a master, on an issue at law, to ascertain the damages, if any, which *W, T.* and *W.* had sustained by the non-execution or rescinding of the contract, and the damages so ascertained to be levied on the execution at law. *Held,* that this decree did not conclude *S.* as to the fact of his individual and sole responsibility, nor as to his right to call on the other members for a rateable *contribution* towards satisfying what might be recovered against him, on the contract.

And the cause having been afterwards put at issue in the Court of Chancery and proofs taken ; it was *held,* on appeal, that *W. T.* and *W* were entitled to recover damages for the breach of the contract, to the amount of their actual expenditures and losses, as far as they had proceeded in the fulfilment of it, on the 1st of *August,* 1815; that *S.* was entitled to contribution from his associates who had by their assent and acts ratified the contract, and who could not under any article of the association, as to a forfeiture of their shares, avoid their responsibility ; that the injunction should be continued, until the amount of such contribution was ascertained ; and that the deficiency only, after what remained of the clear estate of the company had been applied towards the payment of *W., T.* and *W.* should be levied under the judgment at law against *S.*

IN ERROR.
........
ALBANY,
February, 1822.

SKINNER
v.
DAYTON.

sociation to be *The Granville Cotton Manufacturing Company;* that there should be elected annually, a *president,* who should be, *ex officio,* a director, and not less than two, nor more than four *directors,* and a *treasurer.* That the president should have power to call a meeting of the board of directors, whenever he thought proper, on giving three days notice; that he should appoint a *general agent,* whose duty it should be to purchase stock, and vend the goods of the company, and, under the particular direction of the president and directors, to transact all business, &c., and also to appoint a *clerk* to keep the accounts, &c. That each person should, at the time of subscribing for the stock, pay on each share subscribed *ten dollars,* and from time to time, and at all times thereafter, pay such assessments as should be made by the president and directors, or forfeit such share or shares, with all previous payments thereon, &c. That the stock of the company should be divided into twenty shares, &c. The shares were taken by the appellant, and the persons named as defendants in the bill, and *White, Taylor* and *White,* who subscribed two shares. The appellant subscribed four shares, and was elected president, and *W. R.* jun., and *A. P. H.,* were elected *directors, N. H. R.* treasurer, and *W. R.,* jun. clerk.

That on the 25th of *April,* 1815, an agreement was entered into between *White, Taylor* and *White,* of the one part, and the appellant, as agent and director of the company, of the other part, under the hands and seals of the parties. By this agreement *W. T.* and *W.* promised, and engaged to make and deliver at the factory to be erected at *Granville,* of the best materials, and best workmanship, twelve throssel frames, fly-wheels to contain eighty-four spindles each, with iron top-rollers and dead weights, &c. with all the necessary apparatus for complete operation, six frames to be put in operation in the month of *October* following, and six other frames, on the 1st of *May,* 1816. And the plaintiff, and *W. R.* jun., and *A. P. H.,* engaged, in behalf of the company, to pay *W. T.* and *W.* fifteen dollars for each spindle, or 15,120 dollars, viz. 800 dollars in 35 days, and 500 dollars, every 30 days thereafter, until the machinery should be in full operation, at which time, the sum remaining due

IN ERROR.
. . . . . . . .
ALBANY,
February, 1822.

SKINNER
v.
DAYTON

should be paid, &c. This agreement was executed in this manner, to wit, " *White, Taylor* and *White,* (L. S.) For the directors, *Reuben Skinner,* (L. S.)"

The bill further stated that the constitution of the company was made known to *W. T.* and *W.* before the execution of the agreement, and they agreed to subscribe two shares, upon the further condition, that they should be exempted from any assessment which had been made, or which should be made, until the machinery was finished and the factory in operation. That the directors raised by assessments about 1100 dollars ; and on the 27th April, 1815, they laid another assessment on the eighteen shares, of 50 dollars each. *A. D. I. H.* and *R. W.* paid their assessments, amounting to 350 dollars ; but all the other stockholders refused to pay, and forfeited their shares, with the previous payments. About the 27th of *May,* 1815, the president and directors gave notice in writing to *W., T.* and *W.* or one of them, that by reason of the forfeiture of these shares, the company could not go on with their factory, and the contract made with them could not be performed. That *N. H. R.* who delivered the notice, was answered by *W. T.* and *W.* or one of them, that they had made no contracts for the machinery, but had done something towards making the frames. The bill further stated, that about 1536 dollars had been raised by assessments, of which sum about 1100 dollars had been applied to pay for land purchased : that the appellant was sued by *Clark* and *Savage* for stone, for the building, and that the suit was then pending : that 300 dollars had been paid to *C.* and *S.* ; and that the appellant had advanced out of his private funds 217 dollars and 94 cents : that *W., T.* and *W.* had not performed any part of their contract, and were insolvent : that *T.* had absconded, and *M. W.* another of the firm, was imprisoned for debt, and the partnership between them dissolved : that in *August,* 1815, *W. T.* and *W.* sued the appellant in the Supreme Court, for a breach of the contract above mentioned, and in their declaration alleged the nonpayment of 900 dollars, which was payable 35 days after the date of the agreement, 500 dollars, payable on the 29th of *June,* and 500 dollars payable on the 29th July following :

IN ERROR.
........
ALBANY,
February, 1822.

SKINNER
v.
DAYTON.

* 13   Johns.
Rep.  307.

that the appellant in his plea alleged that he executed the agreement, as *director* and *agent* for the company, and in no other capacity ; and that on a demurrer to this plea, the Supreme Court gave judgment against the appellant, in *August*, 1816 :* that notice of this suit was given, on the 25th *August*, 1815, to the other partners, who did not interfere in the defence of it. The bill *prayed* for a discovery, and an injunction, to stay the suit at law, and that the other members of the company might be decreed to pay the appellant the 217 dollars and 94 cents, and such other sums as he may be obliged to pay ; and that the agreement with *W. T.* and *W.* might be delivered up and cancelled, and for general relief.

On the 26th of *January*, 1817, *Marvin White* filed his separate answer, stating that *Randolph Taylor, John White*, and himself, were partners in the business of making machinery for cotton manufactures. He admitted, that he signed, in behalf of the firm, the agreement stated in the bill ; he denied that he agreed, or expected, to look to the members of the association for the performance of it, on their part ; but relied wholly on the liability and responsibility of the appellant, for the fulfilment of the contract. He admitted, that in *May*, 1815, *N. H. R.* delivered him a letter from the appellant and the two directors, stating that several shares had become forfeited, and that the remaining stockholders would be obliged to abandon the business, unless some alteration was made in the contract ; and that *N. H. R.* was authorized to agree to such alteration ; but he denied, that the letter contained any notice that the company would not go on, or that the contract made with the appellant would not be performed. He also denied, that he told *N. H. R.*, that they, *W., T.* and *W.* had made no contracts for machinery, &c. but the contrary : that no proposals as to alterations were, afterwards, made by the appellant, or any other person : that immediately after the contract, he commenced the work on the machinery, and continued the work until the 1st of *August* following, when he received a letter from the appellant, dated *July* 24th, which convinced him that the appellant did not mean to perform the contract : that this letter was the first

notice *W.*, *T.* and *W.* had of the intention of the company
not to go on, and which he considered as amounting to a
notice of the abandonment of the contract, and a refusal
to perform it. That the wages of the workmen employed
on the machinery, at that time, amounted to 2.377 dollars
and 34 cents, and the cost of the materials purchased, to
882 dollars and 66 cents. That when the letter was re-
ceived in *August*, *W.*, *T.* and *W.* were solvent, and in good
credit, and would have executed the contract, if the appel-
lant had performed on his part; and that their subsequant
insolvency was produced by the losses sustained in conse-
quence of the failure of the appellant to perform the con-
tract on his part. That the work and materials finished,
at the expense of 3,300 dollars, had become useless, and
were not worth 400 dollars, &c.

On the 28th of *June*, 1817, *John White* filed his separate
answer, which agreed, substantially, with that of *M. W.*

*Dayton, Wheeler, W. Raymond, N. H. Raymond, A. P.*
*Hitchcock*, and *N. Doane*, filed their joint and several
answer, on the 13th of *January*, 1817. They all denied
that the contract with *W.*, *T.* and *W.* was made with their
approbation or consent, but, on the contrary, they had fre-
quently expressed their disapprobation of it ; and they de-
nied that the appellant had any authority to make the con-
tract in behalf of the company, or that he was the agent of
the company, by any appointment as such. They all sta-
ted, that the company was indebted to them for advances
out of their individual funds, the amount of which advances
was stated by them respectively.

On the coming in of the answers, a motion was made to
dissolve the injunction, which had issued ; and the Chan-
cellor, after argument, on the 28th of *August*, 1817, or-
dered the injunction to be dissolved. (*vide* 2 *Johns. Ch Rep.*
p. 526.) The plaintiff appealed from this order, and the
Court for the Correction of Errors, in *March*, 1819, rever-
sed the decretal order, (*vide* 17 *Johns. Rep.* 357—373.)
and decreed, that the injunction be continued until the
hearing, on the appellant's confessing judgment in the suit
at law, with leave to the respondents to enter up the same ;
and that proceedings be had in the Court of Chancery,

IN ERROR.
........
ALBANY,
February, 1822.

SKINNER
v.
DAYTON.

either by a reference to a master, or an issue at law, to ascertain the damages, if any, sustained by the respondents, by the non-execution or rescinding of the contract, on the part of the appellant, and that the respondents levy those damages only on the execution ; and that the record be remitted," &c.

*Abner P. Hitchcock*, afterwards, died, and the suit was duly revived against *Anna Hitchcock*, executrix, and *Phineas Hitchcock*, executor, &c. And *Ira Hall*, having, died on the 18th of *September*, 1816, *Rebecca Hall*, his executrix, *John C. Parker*, *Clark Northrup*, and *Isaac Hollister*, his executors, were also made parties to the suit, and filed their answers on the 14th of *May*, 1818. They stated, that their testator, and they, as his executors, had paid above 1900 dollars, on account of the company.

General replications were filed, and witnesses examined by both parties, and various exhibits proved.

Several witnesses testified that they heard *Hall*, *Hitchcock*, *N. H. Raymond*, *A. Dayton*, and *W. Raymond*, jun., express their disapprobation of the contract the day on which it was made ; and that they heard the appellant say, on that day, that he " had made a good day's work, and run the company in debt 15,000 dollars ;" or, as two of the witnesses testified, " that he had run the company in debt, that day, to the amount of 15,000 dollars, and that he did not know how the company would like it ;" and that *N. H. Raymond* immediately expressed his surprise and disapprobation. One of the witnesses stated, that there was an understanding between the company and *W.*, *T.* and *W.*, that the latter should give in their proposals, and allow the company ten days to consider of them ; but the appellant concluded the contract on the same day it was made. One witness stated, that he was present when the contract was read in the presence of *Ira Hall*, before its execution, and he made no objection to it ; and that he heard *W. Raymond*, jun. tell the appellant, before the contract was executed, as he was going out, being in a hurry, that he should be satisfied with the contract the appellant should make. It was proved, by an exhibit in the cause, that *W. Raymond*, jun. had confessed, that he had used language from which the

appellant had reason to believe, that he had his approbation and consent to make the contract, for he said to him, that after advising with *Hitchcock* and *Hall*, he must do as well as he could, and that he, *R.* would be satisfied. One of the witnesses deposed, that he heard *Hitchcock* say, that an assessment of 60 dollars on eighteen shares had been laid by the directors, and that 50 dollars of the assessment was to meet the first instalment of the contract with *W. T.* and *W.*

The cause was brought to a hearing on the pleadings and proofs, in *April*, 1821, and on the 9th *August* following, the Chancellor pronounced the following decretal orders :

" This cause having been brought to a hearing upon the pleadings and proofs, and the same having been argued by Mr. *John V. Henry*, of counsel on behalf of the complainant, and by Mr. *Buel* and Mr. *Abraham Van Vechten*, of counsel on behalf of the defendants, *John White*, *Randolph Taylor* and *Marvin White*, due deliberation being thereupon had, it is ordered, adjudged and decreed, and his honour the Chancellor, by the authority of this court, doth order, adjudge and decree, that this cause, as between the complainant and the defendants, *John White*, *Randolph Taylor* and *Marvin White*, be referred to one of the masters of this court, residing in either of the counties of *Albany Rense-laer* or *Washington*, to be agreed on by and between the said counsel for these parties, or to be designated by the Chancellor, if they cannot agree ; and that it shall be the duty of such master to ascertain and report the damages sustained by those three defendants, by reason of the non-execution and abandonment, on the part of the complainant, of the covenant and agreement by and between them and the complainant, made the twenty-fifth day of *April*, in the year of our Lord one thousand eight hundred and fifteen, and in the pleadings set forth or mentioned ; and that the said master, with a view the more precisely to ascertain such damages, take, state and report the amount due to the said three defendants, for the work done and materials furnished, and for all other expenses by them actually and bona fide incurred, pursuant to the said covenant and agreement, prior to the first day of *August*, in the year aforesaid, when the further execution of the said agreement was aban-

IN ERROR.
••••••••
ALBANY,
February, 1822.

SKINNER
v.
DAYTON.

doned, by reason of notice of the inability or refusal of the complainant to fulfil it ; and also to ascertain and report, in addition thereto, the amount of the actual loss and injury, if any, which the said three defendants may have sustained, by reason of the said inability or refusal and consequent abandonment of the said contract, on the said first day of *August* ; and that the report of the master be founded on the pleadings, exhibits and proofs taken in chief in this cause, and on such other evidence as either party may furnish, under the directions of the said master : and that the said master report thereon, with all convenient speed, and that the question of costs, and all further questions, be reserved until the coming in of the report."

" This cause having been brought to a hearing upon the pleadings and proofs, and the same having been argued by Mr. *John V. Henry*, of counsel on behalf of the complainant, and by Mr. *Zebulon R. Sehpherd*, of counsel on behalf of all defendants, except the three last persons named, and due deliberation being thereupon had, it is declared, that the said defendants are not bound to contribute to the damages which may be assessed and levied by, and on behalf of the defendants, *John White, Randolph Taylor* and *Marvin White*, against the complainant, upon the contract of the 25th day of *April*, in the year one thousand eight hundred and fifteen, in the pleadings mentioned, inasmuch as the complainant was not authorized by these defendants, nor by the directors of the *Granville Cotton Manufacturing Company*, to make the same ; and inasmuch as none of the members of the said company, under the constitution of the said company, could legally be bound, without their presence and specific engagement, beyond the capital and funds belonging to them, and actually assessed and paid in under such assessments; and inasmuch as the members of the said company, by the terms of the association, had a right, at all times, to withdraw themselves from any responsibility as members, by refusing to pay their assessment, and submitting to forfeit their shares and all previous payments made thereon ; but inasmuch as the said defendants, by their said counsel, submitted to account to and with the complainant in respect to the lands purchased by and on behalf of said company, and in respect

IN ERROR
........
ALBANY,
February, 1822.

SKINNER
v.
DAYTON.

to the expense actually incurred in and towards the erection of the building erected thereon, for the use of the said company, it is thereupon ordered, adjudged and decreed, and his honour the Chancellor, by the authority of this court, doth order, adjudge and decree, that it be referred to any one of the masters of this court, residing in the county of *Washington*, to take and state an account by and between the complainant and the said defendants, in respect to the purchase of the land, and the contracts and expenses made and incurred in respect to the erection of the building aforesaid, and in respect to the appropriation of the funds actually paid in by either of the parties, on any or all of the assessments made by the directors of the said company ; and that the pleadings and proofs taken in this cause be evidence before the master on such accounting, and that the master be at liberty to examine the parties, or either of them, on oath, touching the premises, and to call for books, vouchers and papers in relation thereto, and that he report with all convenient speed; and that the question of costs, as between the complainant and the said defendants, and all other questions, be reserved until the coming in of the said repor t.'

An appeal was entered from these orders.

The CHANCELLOR assigned his reasons for the decretal orders made by him, for which see 5 *Johns. Ch. Rep.* p. 359. 365.

*Henry*, for the appellant, contended, 1. That the contract of the 25th of *April*, 1815, contained the express declaration, that it was made between *W. T. & W.*, of the one part, and the appellant and *W. R.* and *H. P. H.*, as *directors of the Granville Cotton Manufacturing Company*, of the other part, with perfect knowledge, at the time, by *W. T.* and *W.*, who subscribed the contract, of the constitution of the company, and of the character in which he acted ; and the contract having been executed by the appellant, not in his own name, but " for the directors," by their authority and deliberate ratification, the appellant was not personally bound. As the case now presents itself on the pleadings and proofs, the *authority* of the company to the appellant,

to execute the contract, is fully shown. It steers clear, there-or e, of the decision of the Supreme Court, (13 *Johns. Rep.* 307.,) on the demurrer to the plea in the action of covenant brought by *W. T. & W.* against the appellant. That court gave judgment against the appellant on the ground merely of a want of averment in the plea, that he executed the contract *by authority* of the company. The appellant, after that decision, filed his bill in the Court of Chancery; and *W. T. & W.*, in their answer, do not deny the authority of the appellant to execute the contract in behalf of the company. *M. W.* says, merely, that he did not agree or expect to look to the members of the association, for the performance of the contract, but relied wholly on the responsibility and liability of the appellant; and *J. W.* is silent on the point. *I. Hall* was present when the contract was made; and *W. R.*, Jun. another director, says the appellant consulted him about the contract, and he told him to do as well as he could, after consulting *A. P. H.* and *I. Hall.* Again; an assessment was laid, at a meeting of the directors, on each share, for the very purpose of paying the first instalment of this contract; and *W. R.*, Jun. and *A. P. H.* signed the notice sent to *W. T. & W.*, dated *May* 20, 1815, informing them that the company, in consequence of the shares forfeited, would be obliged to abandon the contract, unless some alteration of it was made. Here, then, was an express ratification of the contract by the two directors, *A. P. H.* and *W. R.*, Jun.; and the maxim is, *omnis ratahibitio retrotrahitur, et mandato æquiparatur.* (18 *Vin. Abr.* 155. 158. pl. 1. *Co. Litt.* 245. b. 2 *Mass. Rep.* 106. 7 *Cranch,* 299. *Randall* v. *Van Vechten, ante,* 60—64.)

It is true, that one partner cannot, by virtue of his general authority, bind his co-partner *by deed;* but if his co-partner afterwards ratifies the act, it will bind him, for such ratification is equivalent to an original authority. (*Harison* v. *Rushforth,* 7 *Term Rep.* 207. 2 *Caines' Rep.* 204.) Where one executes a deed for another, his principal must be named in the body of the deed. (9 *Co.* 76. b. 2 *East,* 142.) One seal is sufficient for all the partners, if the rest assent, even by parol; as where one partner in the presence of the other, with his assent, executed a bill of sale, which

IN ERROR.

........

ALBANY,
February, 1822.

SKINNER
v.
DAYTON.

was sealed with one seal, for himself and his co-partner, that was held sufficient to bind both. (*Bull* v. *Dunsterville,* 4 *Term Rep.* 313.) The distinction is, whether the party has or has not authority from his principal or co-partner. (1 *Chitty Pl.* 21. 3 *P. Wms.* 278, 279. 5 *East*, 148. 1 *Fonbl. Eq.* 287. b. 1. c. 4. s. 18.)

In *Randall* v. *Van Vechten and others,* (*ante,* p. 60.) where the defendants entered into a contract in behalf of the corporation of *Albany,* and affixed their individual seals, and the corporation, by a subsequent resolution, approved of the contract, the Supreme Court held that this implied ratification was sufficient to render the corporation liable, and that the defendants were not personally responsible. From the *constitution* of the company, or their articles of association, the appointment of *directors* necessarily gave them power to do every act within the object and scope of the association. To make a contract for the purpose of procuring machinery, was clearly within the power of the directors.

2. This was not a corporation, but a mere voluntary association of individuals, and the law of partnership applies. If, then, there is a personal obligation on the appellant, it is not an individual one; but his co-directors, *W. R.,* Jun. and *A. P. H.,* are, by their unequivocal ratification of the contract, equally bound with him; and so are all those who were *partners* at the date of the contract.

3. The judgment of the Supreme Court on the demurrer to the plea, in the action of covenant brought by *W. T.* & *W.* against the appellant, is not conclusive, as *res judicata;* (1.) Because, before a trial or judgment in that court, the suit in chancery was commenced, and all proceedings at law enjoined to be stopped, and the injunction has been confirmed by this court: (2.) Because there was no averment in the plea in bar, in that case, that the appellant had authority to execute the contract for the directors; and the decision of the Supreme Court was expressly on the ground of that omission: (3.) Because the pleadings and proofs in the Court of Chancery, brought here on this appeal, place the case on totally distinct grounds from those at law, by the averment and proof of authority in the appellant to contract for the directors.

4. Nor are we concluded by the decree of this court (17 *Johns. Rep.* 357. 372,) reversing the order of the Chancellor for dissolving the injunction, and continuing it until hearing. That decree did not establish the individual responsibility of the appellant, or the right of *W. T. & W.* to recover compensation or damages, or the measure of damages. For it was founded altogether on the *answers* of *W. T. &. W.* which, relative to the subject of the appeal, as far as they denied the equity of the bill, were to be taken to be true ; but the appellant was left at perfect liberty to disprove the answers, and establish his case, so as to entitle him to the relief sought by the bill. The condition annexed by this court, upon which the injunction was to be continued, of confessing a judgment in the suit at law, was an exercise of discretion, in order to prevent any loss to *W. T. & W.* from a suspension of the proceedings, *if* damages *should*, not because they *must*, be recovered.

5. By the order, the appellant is made answerable for the machinery : But *W. T. & W.* are not entitled to any compensation for the machinery alleged to have been made by them, about the 1st of August 1815, when they chose to stop all further work under the contract ; because, such machinery was never delivered, nor even tendered, but was suffered to be sold under an execution againt them, for one hundred and thirty dollars, so that they were incapable of delivering it : and without a *delivery* of the machinery, upon the clearest principles of natural justice, the *price* of it cannot be demanded.

6. The non payment of the instalments, according to the contract did not arise from any fraud in the appellant ; but, as regards him, from an inevitable failure of the funds to arise from the assessment, and which alone could have been contemplated as the source of payment by *W. T. & W.* who were not only parties to the articles of association, but so perfectly acquainted with the contents of those articles, as to have stipulated not to be liable for any assessments upon themselves, until the machinery should be furnished, and the factory in operation. But they, notwithstanding, by their own statement, chose to go on with the work, though they had received a formal notice from the di-

IN ERROR.

. ......

ALBANY,
February, 1822.

SKINNER
v.
DAYTON.

rectors, in the next month after the execution of the contract, that the source of the funds was cut off; and they are not entitled to profits upon work undone.

7. But as the contract was made with the directors, not in their individual, but in their representative character, as directors of the company, of which *W. T. & W.* were, by subscription to the articles of association, partners, and knowing, therefore, its provisions when the contract was made, if *W. T. & W.* are entitled to any compensation in damages, it must be from the partners constituting the company, according to the legal sense of the constitution, or articles of association. And if, according to the legal sense of the articles, the directors were not empowered to make contracts beyond the funds actually raised by assessment, and the responsibility of each partner totally ceased, by his omission to pay the assessments, and the consequent forfeiture of his shares and previous payments, then, *W. T. & W.* as actual partners bound by the terms of the association, ought not to have any remedy, except against the funds raised by assessment.

8. But if the directors had power to contract for making the machinery, without reference to the funds actually raised by assessment, and in anticipation thereof, then none of the persons who were partners at the date of the contract can be suffered, without a breach of good faith, to exempt themselves, by non payment of the assessments and forfeiture, from responsibility and a rateable *contribution* to whatever *W. T. & W.* may be entitled to receive for compensation or damages.

9 If the appellant was individually and solely bound to *W. T. & W.* it might be right, when delay would be the necessary result, not to push their recovery until a contribution should be settled and enforced between the appellant and those liable to bear the burden with him; but, as the appellant is not individually and solely bound, it would be as subversive of justice, and might prove as ruinous, to permit *W. T. & W.* to oblige the appellant to pay the whole, as it would be to suffer a judgment creditor to levy the entire debt from one of many respondents or terre-tenants, or a mortgagee to enforce his mortgage, by a sale of part of the

IN ERROR.
..........
ALBANY,
February, 1822.

SKINNER
v
DAYTON.

mortgaged premises in the hands of one only of many purchasers; and the Chancellor, in *Stevens* v. *Cooper*, and. *Cheesebrough* v. *Millard* (1 *Johns. Ch. Rep.* 425. 409.) has established the great principle of contribution in such cases; and that the party will be stayed until such *contribution* is settled. (3 *Co.* 14. 3 *P. Wms.* 98, 99.)

11. The appellant is, at least, entitled to the aid of the acknowledged partnership property, consisting of water privileges, lands and buildings of great value, as far as the same will go, for his indemnification, of all which, however, he is deprived by the decree of the Court of Chancery.

*Buel*, for the respondents *W. T.* and *W.* contended, 1. That the appellant was personally and individually bound by the contract set forth in the bill; and that this was the legal construction of the contract, as determined by the Supreme Court, on the demurrer, by the Court of Chancery on the motion to dissolve the injunction, and by this Court, on the former appeal. (13 *Johns. Rep.* 307. 2 *Johns. Ch. Rep.* 532. 17 *Johns. Rep.* 366.) The rule for the construction of contracts is the same at law as in equity. It is, then, *res judicata*. The decision cannot be avoided, in this side-way. (*Phillips' Ev.* 223. 234.) The appellant had leave to amend his plea, and might have done so, by inserting the necessary averment of his *authority* to make the contract for the company. It was not necessary to file this bill. He might have filed a bill of discovery, if he wanted the aid of a Court of Chancery, in his defence at law. But he has chosen to take a different course, and has thus concluded himself. A Court of Chancery will not relieve a party against a judgment at law, when he might have made his defence at law. (1 *Johns. Ch. Rep.* 98. 14 *Johns. Rep.* 77.)

2. There is no averment in the bill that the appellant had authority to execute this contract for the company. (12 *Johns. Cas.* 355. 6 *Johns. Rep.* 543.) His proofs, therefore, of the fact, if there were any, would not be admissible. But the proofs given cannot alter the construction of the contract; for they amount to no more than what appears on the face of it.

3. The respondents relied on the contract, and the exe-

IN ERROR.
........
ALBANY,
February, 1822.

SKINNER
v.
DAYTON

cution of it by the appellant, and opinions, suppositions or interpretations of witnesses, as to his personal responsibility, cannot alter its legal construction and effect. [SPENCER, Ch. J. What difference can it make to your clients, whether the appellant alone pays the damages or other persons are compelled to contribute ?]

We ought to be dismissed from this controversy, and receive our money from the person against whom we have a judgment at law, and not be delayed, or turned round to another suit.

Where an authority is given, it must be strictly pursued. (1 *Johns. Cas.* 344. 1 *Str.* 584. 4 *Johns. Rep.* 402. 2 *Str.* 1051. 2 *Burr.* 753. 5 *Burr.* 2682. *Bac. Abr.* tit. *Corporation* (E. 8.) A person must show his authority, or be personally bound. 9 *Johns. Rep.* 334. 3 *P. Wms.* 279.)

4 The decree of the Chancellor, so far as relates to the questions litigated between the appellant and *W. T.* and *W.*, is in exact conformity to the directions given by this Court on the former appeal; and their right to recover the damages actually sustained being established, it necessarily follows, that these damages must be ascertained in the mode directed.

5. *W. T.* and *W.* are not to be deprived of their compensation, on the ground that they did not complete the machinery and tender it. The acts and default of the appellant, sufficiently excuse their non-performance of the work. After the receipt of the letter of the 24th of *July*, 1815, it would have been rashness in them to have continued the work. They were fully authorized to abandon it; and their subsequent inability furnished no ground, in equity, to the appellant, especially, as that inability was produced by his withholding the advance stipulated. (1 *Fonbl.* 391. c. 394. 3 *Johns. Rep.* 535. 2 *Doug.* 634.) These were independent covenants. (10 *Johns. Rep.* 203.)

6. *W. T.* and *W.* can look to no person but the appellant, who alone executed the contract, and is bound by it. Whatever equitable claim for contribution he may have against the other respondents, *W. T.* and *W.* cannot look to them or compensation.

7. The appellant being individually bound for the pay-ments stipulated in the contract, to *W T.* and *W.*, they ought not to be delayed in recovering against him, until the question, whether the other respondents are bound to con-tribute to satisfy such recovery, shall be settled, and the contribution enforced. *W. T.* and *W.* have no interest in that question. The equity of the bill does not extend so far. The whole equity between them and the appel-lant was settled on the former appeal ; and the Chancellor has accordingly made distinct orders. He did not fix the rule of damages ; but reserved that point until the coming in of the master's report ; and the appeal, therefore, as against *W. T. & W.* was premature.

*Z. R. Shepherd*, for the respondents, except *W. T. & W.*, contended, 1. That they were not bound to contribute to the damages which may be assessed or levied, on behalf of *W. T. & W.* against the appellant, upon the contract set forth in the bill, as the appellant was not authorized by these respondents, or by the directors of the company, to make the contract. No such power is expressly given to the president and directors by the articles of association, and it is not incidental to their office, nor is it necessarily implied. The appellant, as agent, therefore, cannot bind the respondents. (5 *Johns. Rep.* 58. 6 *Johns. Rep.* 39 7 *Johns. Rep.* 390. 557.) The rights of third persons are not concerned in this question : all the parties belonged to the association, which was, in one sense, a special co-partner-ship. Neither the appellant nor the directors were author-ized to bind these respondents personally, or beyond the capital actually paid in ; for, by the articles of association, they could not be bound without their presence, or specific engagement, beyond the funds assessed and paid in, inas-much as they had a right, at all times, to withdraw from all responsibility, as members, by refusing to pay their assess-ments, and submitting to a forfeiture of their shares and all previous payments. A power to *assess* does not imply the power to make contracts. The true sense of the constitu-tion is, that after the company had made a contract, the di-

rectors might make assessments to create funds, in order to fulfil such contracts.

IN ERROR.
........
ALBANY,
February, 1822.
SKINNER
v.
DAYTON.

*Van Vechten*, for all the respondents, discussed the several points already stated, and entered into examination of the evidence of the cause, to show, if it was not already *res judicata*, as he contended it was, that the apppellant had no authority to make the contract in behalf of the company, and was, therefore, personally liable, and had no right to call on the other respondents for contribution. He cited, also, *Jenkins* v. *Union Turnpike Company*, 1 *Caines' Cases, in Error*, 95. 1 *Caines' Rep.* 381. *Goshen Turnpike Company* v.*Hunter*, 9 *Johns. Rep.* 217.

*Henry*, in reply, said, it was a fundamental error of the Chancellor, in supposing that the personal and individua liability of the appellant was *res judicata*. The judgment of the Supreme Court was not final. They overruled the plea as defective, and the defendant had leave to plead *de novo*. Instead of pleading anew in that court, he filed his bill in the Court of Chancery, in which he has made all the necessary averments. This court, on the former appeal, sanctioned this course of proceeding. The appellant did not pretend, and, therefore, did not aver fraud or mistake; but he has alleged that he had authority to make the contract.

This company was not a *corporation*. They were mere partners; but being too numerous to act together, they appointed certain persons of their company to act for the whole. Ought not, then, all the members of the association to be bound for the acts of their agents, fairly within the scope of their authority? The specification of certain powers in their articles of association does not exclude other powers necessarily implied. Surely, if the directors had power to do any thing, it was to purchase the machinery essential to the commencement of the operations of the company. The powers to be conferred on a *general agent* related to business of the company to be done after it was in operation. Suppose that every member of the association had executed the contract, by affixing his seal, could

IN ERROR.
........
ALBANY,
February, 1822.

SKINNER
v.
DAYTON.

they, by withholding the payment of their assessments, and the consequent forfeiture of their shares, have exonerated themselves from the contract? This shows, beyond all question, that they had power to contract before calling in the funds. The case of *Jenkins* v. *Union Turnpike Company*, has no application, for that was a *corporation*. The present is the case of an ordinary partnership, and each partner is responsible, to the extent of his means, not according to the amount of his interest merely in the partnership. If the appellant had authority, express or implied, he is not individually and solely responsible. The case of *Dusenbury* v. *Ellis*, (3 *Johns. Cases*, 70.) does not, therefore, impugn the doctrine which we have advanced. The case of *Taft* v. *Brewster*, (9 *Johns. Rep.* 334.) accords with that of *Randall* v. *Van Vechten*, before cited for the appellant, and supports the rule for which we contend. The case cited from *Burrows* is not analogous or applicable to the present case.

This court on the former appeal did not decide on the right to, nor the quantum of damages. One important principle, however, was settled, namely, that the covenants were *independent*.

It is against the clearest principles of natural justice, that the appellant or the company should pay for machinery which has never been delivered. *W. T. & W.* were members of the association; and it was a breach of good faith in them to proceed in the work, when they knew that the company could not go on. They cannot, therefore, be entitled to compensation for imaginary losses, or supposed profits.

The appellant, by the decree of the Chancellor, is denied all *contribution*, and even the benefit of the funds of the company, the water privileges, &c. though he is held to be solely responsible. But we have shown, that the company are equally bound. It is no injustice to postpone *W. T. &. W.* until the contribution is settled, for the *interest* which he will be entitled to recover is the legal remuneration for the delay. And it is a very easy and simple process to ascertain who ought to contribute.

PLATT, J.   The bill filed by *Skinner* against the respondents embraced two objects : 1st. A liquidation of damages, upon principles of equity, arising out of the contract made by the appellant with *White, Taylor and White* : and 2d, To compel the other respondents to contribute, for the damages to be assessed in favor of *White, Taylor and White.*

IN ERROR.
........
ALBANY,
February. 1822.
SKINNER
v.
DAYTON.

That the appellant is personally liable upon the *covenant* which he executed, so as to give to *White, Taylor* and *White*, a remedy against him alone, has been decided by the Supreme Court, as well as the court of Chancery. The whole subject, however, has never before been presented in all its parts and relations ; and in reviewing the decisions at law, and in equity, upon the particular points that have been adjudged in relation to this controversy, I am clearly of opinion, that the doctrine of *res judicata* has no just application on this appeal.

The decision of the Supreme Court (13 *Johns. Rep.* 307) pronounced, that *Reuben Skinner* was personally and individually liable upon the covenant executed by him to *White, Taylor and White.*   But it turned merely upon a question of special pleading.   It was there decided, on demurrer, that to avoid *individual* responsibility, it was necessary for *Skinner* to aver and prove, not only that he *sealed* the contract *for* the directors, &c. but that he had authority from them for that purpose.   It turned upon the technical effect of a seal.   For if the associates are considered as partners, one of them could not bind his co-partners by a *seal*, without special authority: and admitting that, as a partner, the appellant might in this instance have made a contract *without seal*, which would have bound all the associates, yet, as he used a seal, the simple contract, as *partner*, was merged in the covenant ; and thereby it became, in 'judgment of law, his own individual contract, unless he could prove that his associates specially authorized him to seal for them.   The respondent, (*Skinner*) in that case, was allowed to plead *de novo* ; and before final judgment was rendered, he resorted to the court of chancery, where the whole subject has been developed ; and we now have the *proofs* as well as the *pleadings* before us.   The former appeal to this court was upon a *decretal order*, which dissolved the injunction for staying the proceed-

IN ERROR.
........
ALBANY,
February, 1822.

SKINNER
v.
DAYTON.

ings at law. In reversing that decretal order, this court was confined to the allegations in the bill and answer: and the decision on that 'appeal did not involve the questions now presented. We are at liberty, therefore, to disregard the *obiter dicta* of the learned members of this court, who assigned the reasons for that reversal : "*judex non reddit plus quam quod petens ipse requirit.*" We were not then required to decide as to the rule of damages ; nor the right on the part of *Skinner* to *contribution* from his associates ; nor could we then determine definitively as to the eventual liability of *Skinner* ; because, all the defensive allegations in the answer of *White, Taylor* and *White* were denied by the replication of *Skinner*, and the *proofs* were not then before us. The order of this court for continuing the injunction was a *preliminary* step for arresting the proceedings at law, until the whole merits should be ascertained from the *proofs*, as well as the *pleadings*. The condition annexed to that order, that judgment should be confessed and perfected at law, was intended as a *provisional* security merely ; to be used or modified as the equity of the case should *eventually* demand ; and we have a rightful control over that judgment, by perpetual injunction, for the whole or for part, as equity shall require.

As to the validity and binding force of the covenant entered into by *Reuben Skinner*, so as to render him personally and individually responsible, I see no reason to entertain a doubt. Whatever relation he may have stood in, with regard to his associates in the manufacturing company, whether, as co-partner, or as agent, he had a right to *volunteer* his own individual credit and responsibility ; but he certainly had no right to contract, *in that form*, either for the company, or for his co-directors. They had given him no authority to *seal* for them : and yet he voluntarily undertook to perform that office on their behalf ; stating, on the face of the instrument, that he so executed it, for himself and *Wm. Raymond*, jun. and *Abner C. Hitchcock*, as directors of the *Granville Cotton Manufacturing Campany.* He thereby virtually represented and affirmed, that he had authority from his co-directors to make such a contract for them. No bad faith is imputable to *White, Taylor* and *White*

IR ERROR.
... ....

ALBANY,
February,1822:

SKINNER
v.
DAYTON.

in any part of the whole transaction.  They fairly and ho-nestly acquired that security :and when obtained, it was obligatory on *Reuben Skinner*, and on no other person.  He did not bind his *principals*, because he exceeded the authority which they had given him ; and neither law nor equity would tolerate the idea, that the covenant, thus executed, was to be treated as a *nullity*.  If *Skinner* did not bind his principals by sealing that contract, it must follow that he bound himself individually.  *White, Taylor* and *White* were no doubt induced to believe, that they had the covenant of *all the three directors* of the manufacturing company : and when their mistake is discovered, shall it be allowed, that *Skinner*, who led them into that error, shall take advantage of his own wrong, and be held irresponsible ?  By executing that contract, *Skinner* neither created any obligation, nor gave any right of action against any person but himself.  The *Grannville Manufacturing Company* had a right to adopt, or disavow the contract as they pleased; and *Skinner* had no right to cast upon *White, Taylor* and *White*, the burthen of proving a subsequent ratification by the company.  *White Taylor* and *White* had a right, therefore, to *elect* to consider and treat it as the personal and individual covenant of *Skinner*; and they have uniformly done so.  Whether the co-directors, or the members of the association subsequently ratified and adopted the contract, so as to render them liable for contribution, is a distinct question, which I shall, hereafter examine.  But I think it clear, that until such ratification, *White, Taylor* and *White* had no remedy against them, either in law or equity.  And if, *at any time*, personal and individual responsibility attached to · *Reuben Skinner* upon the covenant, *White, Taylor* and *White* had a right to rely on his security alone, and to leave *him* to seek aid or contribution from his associates.

But it is insisted, by the counsel for the appellant, that *White, Taylor* and *White* have no equitable claim for damages, because they chose to stop in the progress of the work; and have never delivered, nor tendered, any part of the machinery.

This was an excutory contract, which could not be altered nor rescinded, without the mutnal consent of the parties; and

IN ERROR.

ALBANY,
February 1822.

SKINNER
v.
DAYTON.

I have no doubt, that *White, Taylor* and *White* might have proceeded, if they chose, to a completion of the whole contract on their part; and then they would have had a right to recover the whole price according to the contract. But I think the letters of the 20th of *May*, and the 24th of *July*, 1815, with all the concomitant circumstances of the case, were abundantly sufficient to excuse and dispense with any further performance of the contract on the part of *White, Taylor* and *White*. They were notified that the stockholders had refused to pay the assessments, and would " of necessity have to abandon the business, unless some alteration could be made in the contract." *White, Taylor* and *White* were under no obligation to *alter* the contract; and in my judgment they had a right to stop the progress of the work, and to have a liquidation of damages, upon equitable principles, as to what had been rightfully done under the contract, before the 1st of *August*, 1815, when it was mutually abandoned.

That *White, Taylor* and *White* had subscribed for shares in that association cannot, I think, vary the construction of their agreement with *Skinner*, nor affect their rights under it, except it be to render them contributory, if the point of contribution shall be determined against the stockholders.

The next question in order is, as to the rule of damages upon the liquidation of the contract. There is great difficulty in prescribing the rule; and there will probably be still greater difficulty in the application of it. According to my view of this question, the master should be directed to ascertain and report, 1st, What amount of labour was performed, what amount of materials was procured, and what amount of expenses were actually and *bona finde* incurred by *White Taylor* and *White*, pursuant to the covenant, up to the 1st day of *August*, 1815 ; 2dly, What amount of profits (if any) would have accrued to *White, Taylor* and *White*, if the contract had been mutually fulfilled by the parties in good faith, and in all its parts: 3dly, What proportion did the profits (if any) upon the labour, materials and expenditures so applied under the contract up to the 1st of *August*, 1815, bear to the estimated profits (if any) on the entire and mutual fulfilment of the contract : and, 4thly, What was the available

IN ERROR.
.........
ALBANY,
February, 1822.
SKINNER
v.
DAYTON.

amount in value to *White, Taylor* and *White,* in fair open market on the 1st day of *August,* 1815, of all the actual labour, expenses and materials so appropriated and applied by them under the contract, up to that day ; to the end, that *White, Taylor* and *White* may be *credited* with the amount of labour, materials and expenditures found to have been so applied on the 1st of *August,* 1815 ; and also *credited* for the *proportion* of profits (if any) so to be found under the 3d head of inquiry above stated ; and that interest be added to both those items of credit, from the 1st day of *August,* 1815 ; and that they be *debited* with the available amount of labour, expenses, and materials so found to have been appropriated and supplied by them, under the 4th head of inquiry, together with interest thereon from the 1st day of *August,* 1815 : and the balance of such account will be the amount of damages to be recovered under the contract.

As *White, Taylor* and *White* elected to abandon the further execution of the contract, when that option was tendered to them by the opposite party, I can perceive no equitable grounds for their claim of *profits,* beyond the *pro rata* allowance.

Suppose the fair calculation of profits on the entire and successful completion of the whole machinery, to be $3000, as estimated by some of the witnesses ; yet it is to be considered, that they must have devoted their time and services, and capital, and credit, for nearly a year longer ; and during that time, they would have been subject to a great variety of risks and unfortunate casualties, from all which they were relieved by the mutual abandonment of the contract. To entitle them to profits on the whole machinery, they must have *earned* those profits, by completing the whole work, which they have not done.

It is contended, that in fact, *White, Taylor and White* had *no option* : that the default on the part of *Skinner* in not paying the two first instalments, deprived them of the means of prosecuting the work ; and that this *compulsory* abandonment of the contract was the cause of their utter ruin in business and property. These are among the unfortunate consequences which daily occur, from the want of punctuality

IN ERROR.
........
ALBANY,
February, 1822.

SKINNER
v.
DAYTON.

in pecuniary engagements; but neither courts of law nor equity can measure damages by such remote consequences, or contingencies. If the money had been punctually paid according to contract, it might perhaps have been profitably used; but it *might* also have been lost or wasted. The lawful rate of interest is the only standard which we can recognize, for damages arising from the non-payment of money, upon such contracts.

Next, in order, is the important question, whether the stockholders or members of " The Granville cotton manufacturing company," are liable to contribution for those damages? And if liable, are they bound *personally*, to the whole extent of the damages, or only to the extent of the common property and funds of the company?

This was a voluntary association for the joint and personal benefit of its members, who by the agreement, styled " the constitution, " dated the 19th day of April, 1815, declare their object to be " for manufacturing cotton yarn and cloth." By the 1st article they adopt a name, viz. " The Granville Cotton Manufacturing company." The 2d article provides for a proper selection of their members to transact the business of the company, to be called " President and Directors " and a Treasurer.

By the 3d, 4th and 5th articles, particular powers and instructions are given in regard to the employment of a sub-agent and clerk, and their duties. The 6th article declares that " each person shall at the time of subscribing for stock " in said company, pay in cash on every share by him or " her subscribed ten dollars; and shall from time to time, " and at all times hereafter, pay such assessments as shall be " made by the President and Directors, or forfeit such share " or shares with all previous payments made thereon."

The construction to be given to the 6th article will determine the character of the association. The exposition given by his Honor the Chancellor, is, that " the company " could not be bound beyond the capital paid in; and the " president and directors had no power under the articles " of association, to bind the members individually. Whoe- " ver dealt with the company as such, and without resort- " ing to a personal covenant, was to be presumed to deal

IN ERROR:
.......
ALBANY,
February, 1822.

SKINNER
v.
DAYTON.

" with them, according to the terms of their constitution, and
" to give the credit to the funds of the company actually
" paid in, or to be paid in, under assessments duly made.
" He had no right to look to the credit of the individual
" members, unless these individual members entered into
" a personal covenant or contract."

In considering the avowed object of this association, and
examining all the provisions of their constitution, my mind
has been led to a different conclusion. It was an inconside-
rate and adventurous enterprise ; and, in all probability, the
question now agitated, of personal liability for contracts
made on behalf of the company, in the event of a deficiency
of the joint fund, never actually occurred to the minds of
the associates. If they meant to guard against such indivi-
dual responsibility, it is extraordinary that they did not, in
their constitution, expressly stipulate against it, and give
public notice accordingly, instead of leaving it to silent
inference. And the question also presents itself to my mind,
with some force, why, if they intended to avoid personal lia-
bility, did they not avail themselves of the statute which
authorized them to incorporate themselves as a manufactur-
ing company, by filing a certificate in the Secretary's Office ?
(Act of 22d *March,* 1821.) The provisions of that statute
exactly applied to their case, and it depended upon their
own volition, whether they would avail themselves of that
shield or not.

My first proposition is, that if the terms of their associa-
tion do not, by fair and necessary construction, *negate* the
intention of personal liability, in judgment of law and equi-
ty, the members of the company are individually responsi-
ble for all debts contracted, for the objects, and within the
scope of the association. If they did not mean to be per-
sonally liable for deficiencies, good faith required that they
should speak *unequivocally,* and give notice that such were
the terms on which they contracted. If they had accepted
the franchise of an incorporation, offered to them by the
Legislature, their rights and duties would have been dis-
tinctly marked and understood, and no person would have
confided in their personal responsibility.

In my judgment, the 6th article, (which is the only one

IN ERROR
•••••••
ALBANY,
February 1822.

SKINNER
v.
DAYTON

relied on for that purpose) contains no such *negation* of personal liability. A capital was necessarily to be provided ; and it appears to me, that the only object in that article o the copartnership, and which entirely satisfies all the words of it, was to determine the amount, and the rule of contribution, in regard to the sums to be invested as capital in their joint concern. And the stipulated forfeiture was intended merely as a summary means of enforcing the punctual compliance with that essential requisite. They were to pay in their proportion of capital, as required by the directors, or to incur the penalty of forfeiture. A forfeiture of shares under that article would undoubtedly also operate as a dissolution of the partnership, as to the person so forfeiting his shares, in regard to all contracts *subsequently* made by the directors. To say that the 6th article was intended to secure to each stockholder a right to withdraw from the partnership whenever he pleased, would be adopting a construction which imputes to that article no positive meaning, nor any practical effect. Because, each partner would have had the same right, without any such provision. It is a right inseparably incident to every partnership.— There can be no such thing as an *indissoluble* partnership. Every partner has an indefeasible right to dissolve the partnership, as to all future contracts, by publishing his own volition to that effect : and after such publication, the other members of the firm have no capacity to bind him by any contract. Even where partners covenant with each other, that the partnership shall continue seven years, either partner may dissolve it the next day, by proclaiming his determination for that purpose : the only consequence being, that he thereby subjects himself to a claim for damages for a breach of his covenant. The power given by one partner to another, to make joint contracts for them both, is not only a revocable power, but a man can do no act to devest himself of the capacity to revoke it. It is remarkable, that there is a perfect silence throughout the instrument of association, in regard to profits and loss, and yet the law will intend that both were contemplated ; and, in the absence of all explanation on their part, we must intend, that they were to be borne and enjoyed by the associates, in propor-

IN ERROR.
.......
ALBANY,
February, 1822.

SKINNER.
v.
DAYTON.

tion to their shares of interest, which are expressly stated. As to their organization and interior economy for conducting their joint concerns, the associates have made a law for themselves, by their constitution, as they had a perfect right to do. Articles of co-partnership, in almost every case, contain some *peculiar* provisions or restrictions which are valid and binding between the partners, as such, but which have no application to those with whom they contract. These associates engaged in a bold enterprize, exposed to great risks, and involving large expenditures. They provide for a regular succession of directors; but there is an utter silence in the constitution, in regard to their power of making contracts for land, buildings or machinery; and yet, from their name of office, and the obvious design of their appointment, we must suppose it was intended, that they should be the acting partners or agents of the company; and if they had power to act at all, we must presume they had power to contract for machinery for spinning cotton, which was the avowed design of the institution.

The only *specified* power conferred on the directors is (in 4th article) that " it shall be the duty of the president and " directors to appoint a general agent, whose duty it shall be " to purchase stock, and vend the goods of said company," &c. But this obviously refers to a sub-agent, who was to conduct the ordinary business of the company, after the establishment should be in operation.

The whole scope of the testimony shows, that the members of the association recognized the directors (of whom the president was one) as the persons authorized to contract on their behalf: and the question now is, had they power to contract, so as to bind the individual associates beyond the common funds so placed under the management and control of the directors? In my judgment, the directors had power to bind the stockholders individually and personally, for debts *bona fide* contracted in the regular prosecution of the business committed to their charge; and every contract made by them, as directors, in general terms, was obligatory on the associates to that extent. Whether any private individual stockholder had power to bind his associates, by assuming to contract, contrary to the fundamen-

tal rules and organization of the company, is a very differ-
ent question, which does not arise in this case.

In the case of *M·Neven* and others v. *Livingston*, &c. *(17
Johns. Rep.* 437.) this court decided, that joint proprietors of
patent-rights for navigating by steam, on the mere ground
of such joint interest, could not bind each other by any con-
tract with any assignee of such right, "*not connected with the
enjoyment and exercise of their common privilege,*" which is
in perfect accordance with the doctrine which I apply to
this case. In the case of *Livingston* v. *Lynch,* and others,
(*4 Johns. Ch. Rep.* 573.) his honor the Chancellor decided
that the association of stockholders of the North river steam
boat company was not a *partnership,* in a commercial sense;
but the parties were *tenants in common* of the property and
franchises belonging to the company: and that the consti-
tution adopted and subscribed by all the members, as the fun-
damental articles of their association, could not be abroga-
ted or changed, except by unanimous consent. That was
a suit by one of the associates against the other members of
the company, to enforce the original stipulations of their
constitution, which provided for the custody of their boats,
the appointment of their officers, and the deposit of all mo-
neys received by the captains ; which provisions, a majority
of the stockholders had resolved to modify and vary. In
maintaining the rights of the individual member, against the
innovations attempted to be imposed on him, by a majority
of his associates, the Chancellor undoubtedly decided cor-
rectly. For admitting them to be *partners,* in relation to
contracts with others, they had a right to make a law for
themselves, as to all the objects of that decree. The rea-
soning of the Chancellor, on that occasion, in reference to
the case before him, was conclusive : but with great defer-
ence, I remark, that there are several gratuitous *dicta* in that
case, to which my judgment cannot yield assent. Although
the general law of partnership, which gives to each partner
an equal right to the custody and control of the chattels
and money of the company, was, in that instance, modified
by convention of the parties ; yet, while *unincorporated,* it
appears to me, they were personally responsible as partners,
for all contracts made by their acknowledged agents, with-

IN ERROR.
........
ALBANY,
February, 1822.

SKINNER
v.
DAYTON.

in the scope of their employment, and " connected with the enjoyment and exercise of their common privilege." Suppose, the ostensible agent of such a company contracts for a steam-engine, or for fuel for their use, can it be admitted, that in case of a destruction of the steam boats, or a deficiency in the common fund, the individual members of the association can escape payment, by abandoning their worthless stock ?

In the case now before us, the Chancellor remarks, that the right of abandoning, merely on forfeiture of stock, was reserved to the members, " as a check to extra-
" vagance and abuse in the management of the company
" concerns ; " and " it can not be supposed that individuals
" who consented to take certain shares upon these terms,
" intended to place their whole fortunes at the power and
" disposal of the directors."

In answer to these remarks, I apply the maxim " *judicandum est legibus, non exemplis.*" It may justly be said, that the object of these associates was private gain : they acted voluntarily, and had a right to choose their own associates. Every partnership implies mutual confidence, and involves great risks ; but it accords best with the principles of equity and public policy, that whoever speculates for gain, in that mode, should also incur the *hazards* which attend it. The members of such associations, or those who represent them as agents or directors, must be presumed to know the amount and condition of their funds and resources ; while others who contract with them, have not the means of estimating their joint funds. It, therefore, seems to me that the wisest and most salutary " check against extravagance and abuse, in the management of the company concerns," is in holding the individual members responsible for deficiencies, to *bona fide* creditors.

If a contrary doctrine be established, it will tempt men to speculate, on the public credulity, by rash and ill advised schemes, which, if they happen to succeed, may enrich the adventurers; but where failure and consequent ruin are the result, the calamity must fall on other heads than their own. Bold enterprise and adventurous speculation, for pecuniary profit, form one of the *character-*

IN ERROR.
........
ALBANY,
February, 1822.

SKINNER
v.
DAYTON.

*istic foibles* of our countrymen, and instead of being encouraged and lured on by personal indemnity, that spirit ought to be checked and restrained by the impressive consideration of individual risk and responsibility.

This brings me to the question, whether the contract made originally by *Reuben Skinner* alone, with *White, Taylor* and *White,* was subsequently *ratified* and *adopted* by the directors of this company ? The only directors were *Reuben Skinner, Wm. Raymond, jun.* and *Abner P. Hitchcock.* The answer of *Wm. Raymond, jun.* " denies that he ever approved of the said contract in any shape, or that he has ever intentionally done any act or thing to ratify the proceedings of the appellant." " He denies that ever the appellant consulted him upon the expediency of making the contract upon the terms ultimately concluded ; and if he had done so, this appellant would have dissuaded and protested against the same." And *Abner P. Hitchcock,* (the other director) in his answer, "wholly denies that he ever directly or indirectly gave his assent to said contract, before or after its execution."

[Here his honor detailed the testimony taken in the cause.]

In regard to *Hitchcock,* the other director, I perceive no evidence that he was consulted, or that he assented to the contract *before it was made.*

[Here his honor stated the testimony of the witnesses.]

On weighing the evidence on this point, I concur in the opinion of his Honor the Chancellor, " that there is not the " requisite evidence that the two directors, *Raymond* and " *Hitchcock,* ever authorized the *making* of the contract. "

But, in my judgment the Chancellor erred in his next conclusion, viz. " that the contract was never submitted to " the consideration of the board of directors ; and that it " never received their united deliberation and assent."

It is proved, without contradiction, that soon after the contract was made, *Skinner,* as president, convened the board. All the directors attended ; he laid before them the contract which he had made with *White Skinner* and *White,* which on the face of it explained, that he had assumed to act as their agent ; their names were recited in it as the parties to be bound by it; they made no objection. One of them

IN ERROR.
..........
ALBANY,
February, 1822
SKINNER
v
DAYTON.

moved a resolution for an assessment of $60 on each share, with an explanation, that it was intended for the express purpose of meeting the first instalment on that contract; and the time of payment was made to correspond with the contract, allowing time to send it to *White*, *Taylor* and *White* at *Troy*. The other director seconded the motion, and the resolution for such assessment was unanimously agreed to. On the 20th of May, 1815, the three directors wrote to *White*, *Taylor* and *White* a letter, in the following words: " The bearer, Mr. *Nathan H. Raymond* is authorized *by us* to call on you respecting the contract made for machinery *for the intended factory* : several shares have been forfeited, and consequently the remaining stockholders feel embarrassed, and will of necessity have to abandon the business, unless some alteration is made in the contract conforming to the circumstances of the present stockholders. The bearer is authorized to make such alterations as the company feel able to meet." This letter was signed by all the directors ; and to me, it seems pregnant, in every line, with the most satisfactory evidence, that the directors had ratified and adopted the contract, and meant to treat it as if it had been duly executed by them all.

These facts are undeniably proved; and although the two directors swear in their answers, that they " did not consent to, nor ratify the contract," we must intend that they did not mean to deny these facts, which they soon after published in the church, to a host of witnesses ; but that they swore to what they understood to be the *legal inference* from those facts. On reviewing the whole series of conduct on the part of the directors, after the contract was presented for their ratification, my mind is irresistibly led to the conclusion, that it was adopted by them in their official character. They determined to carry it into effect ; and laid an assessment for that purpose: and thereby they *made their election,* and are *concluded* by it.

When *Skinner* told them " he had run the company in debt $15,000, and did not know how they would like it," and presented to them the contract which he had sealed, good faith required, that they should *then* have taken their stand, and have apprised him of their intention, if they meant to disavow

IN ERROR.
.......
ALBANY,
February, 1822.

SKINNER
v.
DAYTON.

the contract, and throw the burthen on him alone. If they had done so, he might have found other associates, and provided other means of carrying the contract into effect ; and secured himself against a ruinous loss, which now would be inevitable. "*Ratihabitio retrotrahitur, et mandato æquiparatur.*"

My opinion, therefore, is, that in regard to the question of contribution, the stockholders stand in the same situation as if their agents, the directors, had originally made the contract on behalf of the Company ; and that all who continued to be stockholders, *at the date of the ratification of that contract,* are personally liable to such contribution, if the joint fund shall prove insufficient; and that *White, Taylor* and *White* are to be included as stockholders, for two shares, in respect to such contribution. As creditors, they have a right to recover damages under the contract ; and as *copartners* they are bound to contribution. Their subscription for two shares of stock was accompanied by a stipulation, that they *(White, Taylor* and *White)* " should be exempt from any assessment which had been or should be made until the factory should be in operation :" but this exemption extends only to *assessments* for capital stock to be invested in the joint concern ; and has no application to their mutual responsibility for the debts of the Company beyond the joint fund.

It follows, therefore, that it would be inequitable to allow *White, Taylor* and *White* to sue out execution, until the measure of contribution is settled, and a reasonable time has been allowed to enforce it.

For these reasons, my conclusion is, that the decretal orders appealed from ought to be *reversed.*

YATES, J. This appeal is from two decretal orders of the Court of Chancery: the one is a reference to a master, as between the appellant and the respondents, *White, Taylor* and *White,* to ascertain and report the damages sustained by them, by reason of the non-execution and abandonment, on the part of the appellant, of the agreement between them of the 25th of *April,* 1815, requiring the master to report the amount due to those three respondents, for the work done and the materials furnished, and for all other expenses by them *bona fide* and actually incurred, pursuant to the said agreement, prior to the 1st of *August,* 1815, when the further execution of

the agreement was abandonded, by reason of notice of the inability or refusal of the appellant to fulfil it ; and also to ascertain and report, in addition thereto, the amount of the actual loss and injury, if any, which *W. T.* and *W.* may have sustained, by reason of such abandonment of the contract, reserving the question of the costs and all further questions, until the coming in of the master's report.

The other decretal order complained of, is, that the respondents were not bound to contribute to the damages which might be assessed and levied by and on behalf of the respondents, *White, Taylor* and *White*, against the appellant, upon the above mentioned contract, and ordering a statement of accounts by the master, in furtherance of such decision.

A suit at law having been brought on this contract against the appellant, for these instalments, amounting to $1900, it is insisted, that the judgment on the demurrer to the plea pleaded in that cause, has settled the question as to the individual responsibility of the appellant. In my view of the subject, this decision cannot be considered as conclusive. The fact is, that the suit in Chancery had been instituted, and all proceedings at law enjoined, before such judgment had been rendered. Besides, the ground of that decision against the defendant in the Supreme Court, was an omission in his plea in bar, of an averment that the appellant had authority to execute the agreement for the directors ; and the bill and evidence clearly show facts and circumstances not available. in the defence at law ; and that the appellant, in order to secure the benefit of this evidence, has been obliged to resort to a court of equitable jurisdiction for relief. The judgment of the Supreme Court cannot, therefore, be deemed *res judicata*, so as to preclude an equitable remedy. ; nor does the decree of this Court, reversing the order of his honour the Chancellor for dissolving the injunction, establish the individual responsibility of the appellant, so as to prevent him from claiming his right to contribution from the members of the association, or some of them. That decree was made on the bill and answer of *White, Taylor* and *White*, which answer was then properly taken to be true, leaving to the appellant the right, afterwards, of disproving it, and howing facts from which he might still be entitled to the

IN ERROR.
........
ALBANY,
February, 1822.

SKINNER.
v.
DAYTON

IN ERROR.

ALBANY,
February, 1822.

SKINNER
v.
DAYTON,

contribution sought by the bill, and, as stated by the counsel, on the part of the appellant. The condition annexed, upon which the injunction was to be continued, of confessing a judgment in the suit at law, was an exercise of discretion by this Court, with a view to the security of *White, Taylor* and *White*, for any loss by suspension of the proceedings, without conclusively deciding with regard to damages. The question, therefore, whether the alleged authority in *Skinner* to execute the contract for the other directors and the other stockholders, has been made out by the pleadings and evidence, subsequently taken in the cause to entitle him to contribution, still remained open, and, of course, was a proper subject of investigation for the court below, notwithstanding the judgment at law and the decree of this Court.

In the decision of this Court alluded to, it is stated in the opinion delivered by me, that the respondents, *White, Taylor* and *White* were entitled to the damages sustained by them in consequence of the rescinding of the contract; and that from the circumstances disclosed, such rescinding must be deemed to have been by mutual assent, which placed the rights of the parties under it, on grounds different from what would have been the case, if *White, Taylor* and *White* had continued their operations. The profits, therefore, which might have been made, if the contract had been complied with on their part, I am inclined to think, ought not to be taken into account. It certainly was not intended by me, that it should be considered a subject of inquiry, in ascertaining those damages. They had performed the contract in part; and as far as that had been done, they were entitled to just compensation in damages, for their actual losses and expenditures; that is, as far as they had proceeded in complying with the contract.

It is undoubtedly settled law, that one person cannot seal for another, without express authority; and that by assuming to act without it, a personal obligation is created. That authority may, however, in some instances, be by *parol;* as in the case of *Ball* v. *Dunsterville,* (4 *Term Rep.* 313.) where a bill of sale was made by two partners, sealed with the seal of one of them, for and in behalf of himself and the other, and by the authority of the other, and in his presence;—the

Court decided, that it was a good execution though sealed <span style="float:right">IN ERROR.</span>
with the seal of one only.

The authority set up by the appellant, with regard to the
execution of this agreement, has not been recognized, or as-
sented to by *White, Taylor* and *White,* so as to confine them,
in seeking compensation, to the directors, or the members of
the association. There certainly appears to have been no
previous resolution of the directors or the company, entered in
their minutes, expressly authorizing the appellant to execute
it, or *Skinner* never could have expressed himself as he did,
" That he had run the company in debt, that day, to $5.000,
" and he did not know how they would like it." Although
this shows, that no resolution stating the terms of the con-
tract specially, had been entered in the books of the company,
still it is by no means conclusive that the appellant acted alto-
gether without authority. The terms of the contract could
not be known to the company until made, and he might in
this conversation have alluded to the terms only. Under
those circumstances, no doubt remains of the individual lia-
bility of the appellant to *White, Taylor* and *White,* for the a-
mount of the damages on the contract, as before stated, if
they elected to resort to him exclusively. But this individual
responsibility, under the control of *White, Taylor* and *White,*
does not release the other stockholders from contribution.
The conditional signature for the shares subscribed, so far
implicated *White, Taylor* and *White,* as to subject their
recovery to the equitable qualifications and restrictions
necessarily arising out of the facts disclosed in the case.
The form of the contract, and signing, as for the directors,
must be deemed the exclusive act of the appellant, as it re-
gards *White, Taylor* and *White ;* and cannot affect their re-
medy against him, except by subjecting it to the restrictions
mentioned. If the assumption to seal for the directors, had
been without their knowledge, or subsequent assent, and
wholly unaccompanied by acts of recognition or ratification
on their part, there must have been an unqualified recovery
for the damages against the appellant, not subject to any re-
strictions by the Court of Chancery ; and he, of course, would
have been without remedy against the other members of the
company.

<div style="float:right; text-align:center">
ALBANY,<br>
February, 1822.<br>
<br>
SKINNER<br>
v<br>
DAYTON.
</div>

IN ERROR.
· · · · · · · ·
ALBANY,
February,1822.

SKINNER
v.
DAYTON.

It cannot, however, be denied, that the source from whence the payments were to have been derived was known to both parties; and having failed, the disappointment must have been equally unexpected to both; because the respondents, *White, Taylor* and *White*, subscribed the articles of the association, on an express condition or stipulation against assessments on themselves, until the factory should be in operation. They, therefore, knew that the payments were to be drawn from those assessments; and the refusal of the stockholders to pay, when called upon, being an incident not to be avoided, and beyond the control of the appellant and *White, Taylor* and *White*, I can see no sound objection to its affording grounds for the interposition of a court of equity, in postponing the collection of the amount of damages which might be found against the appellant, until the question of contribution shall be settled between him and those of the company who may be adjudged liable to bear the burthen with him, and a reasonable opportunity afforded to enforce such contribution. It will readily be perceived, that by adopting this measure, recourse will be had, in the first instance, to the legitimate source from whence the parties to the agreement originally expected the funds should be derived. It is, therefore, no matter of surprize on *White, Taylor* and *White*. And this course, it would seem to me, is dictated by the soundest principles of equity; for it cannot be controverted, but that the present situation of the appellant has arisen from the default of others, without fraud or collusion on his part; a result, as has been before stated, equally unexpected to both parties to the agreement, and inevitable, as it regards the appellant.

This leads me to the question of contribution before alluded to; and, on that subject, I am inclined to think, that the evidence fully authorizes the appellant's claim, on some of the respondents, to contribute rateably to the payment of the amount of damages which may be recovered against him, according to their respective shares in the company.

That the appellant was about entering into a contract for machinery, was known to some of the company, is a fact which cannot be denied. And that the assent to the making of such contract by him had been obtained of some of the mem-

IN ERROR.
........
ALBANY,
February, 1822.

SKINNER
v.
DAYTON.

bers individually, also appears by the testimony of several witnesses. It must, however, be admitted, that according to the terms of the contract, such knowledge and individual assent alone, would not be sufficient to entitle the appellant to claim contribution from the other stockholders. If the contribution sought for, therefore, rested merely on what took place previous to the making of the agreement with *White Taylor* and *White*, I should entertain doubts on the subject. But connecting those facts and circumstances with the subsequent acts of the directors, it seems to me that sufficient appears to implicate all the stockholders, (except *Nathan Doan*, who had forfeited his share before the contract had been entered into,) so as to render them liable to contribution. For if the directors had the power, by the articles of association, to authorize an agent to make the contract, it would be extraordinary, indeed, if they, as principals, elected to conduct the business themselves, they should not be at liberty to do it.

The assessment of the 27th of *April*, only two days subsequent to the consummation of the contract, was unquestionably made by them with a view to meet the payment of the first instalments; and the letter of the 20th of *May*, 1815, under the signature of the appellant, *William Raymond, jun.* and *Abner P. Hitchcock* conclusively proves, that they, as directors, had recognized and adopted the contract made with *White, Taylor* and *White*. In that letter they state, that *Nathan H. Raymond*, the bearer, was authorized to make such alterations as the company felt able to meet. *Raymond* was *Treasurer* to the association; and it is evident that *Ira Hall, Abraham Dayton* and *Reuben Wheeler*, by their acts and declarations, recognized and adopted it. It cannot be pretended, that they did this without information as to the true situation of the company. It is, therefore, clear, that the subsequent acts of the directors evinced their views and intentions in relation to this agreement. This ratification of the contract by the directors, in my view of the subject, establishes the appellant's claim for contribution from all the stockholders. But admitting that the assent of all was necessary to make them liable, the testimony is conclusive as to the interference of those who were

IN ERROR.
········
ALBANY,
February, 1822.

SKINNER
v.
DAYTON.

stockholders at the time, and immediately after the contract had been entered into. *Henry Buckley*, a subscribing witness to it, states, that *Ira Hall* and *William Raymond, jun.* were present when it was made, and assented to it. That *Reuben Wheeler*, after it was executed, declared that the company were bound by it. That there was not one of them who dared deny it. That in the fall of 1816, *Abner P. Hitchcock* and *Reuben Wheeler* were both desirous to reduce the contract to 500 spindles. *Sylvester Norton*, another subscribing witness, and *Richard Savage* confirmed the above testimony as to *Ira Hall* and *William Raymond. jun.* *Samuel Clark* states, that *Abraham Dayton* told him his $1000 would be applied on the contract for the machinery. The testimony of *Ebenezer Walker*, *Charles Buckley* and *Martin Lee*, goes to show that *Abner P. Hitchcock* knew of the agreement, and confessed that assessments had been made to meet the instalments. That the directors were called together for the purpose.

*Fonblanque*, (vol. 1. p. 295. b. 1. ch. 4. sec. 18.) states, that if a third person treats for one that is absent, without his order, but undertakes for his consent, the absent party does not enter into the covenant until he ratifies it. The case of the *Bank* of *Columbia* v. *Patterson's* heirs, decided in the Supreme Court of the United States, (7 *Cranch*, 299.) contains principles peculiarly applicable to the present. It appears that in 1804 a contract had been made by *Patterson* and an authorized committee of the *Bank*, under their private seals, whereby *Patterson* agreed to do all the carpenter's work to the *banking house*, in the manner therein stated, which was referred to in a subsequent agreement, in 1807; by which last agreement, all the work done by *Patterson* was to be measured and valued by two persons named, according to certain rates. The court decided, that upon a special contract executed on the part of the plaintiff, *indebitatus assumpsit* would lie for the price, and that a simple contract was not merged in a sealed instrument, which merely recognizes the debt, and fixes the mode of ascertaining its amount; and that upon general counts, a special agreement executed, might be given in evidence; that wherever a corporation aggregate is acting within the scope of the

IN ERROR.
........
ALBANY,
February, 1822
SKINNER
v.
DAYTON.

legitimate purposes of its institution, all parol contracts made are express promises of the corporation, and all duties imposed on them by law, and all benefits conferred at their request, raise implied promises, for the enforcement of which an action lies. *Judge Story*, in giving the opinion of the court, says, " the contracts were for the exclusive use and " benefit of the corporation, and made by their agents for pur- " poses authorized by their charter. The corporation pro- " ceed, on the faith of those contracts, to pay money, from " time, to time to the plaintiff's intestate ; although, then, an " action might have laid against the committee personally, " upon their express contract, yet as the whole benefit result- " ed to the corporation, it seems to the court that from this " evidence the jury might legally infer that the corpora- " tion had adopted the contracts of the committee, and had " voted to pay the whole sum which should become due un- " der the contracts, and that the plaintiff's intestate had ac- " cepted their engagement."

If this principle of subsequent adoption and ratification is applicable to corporations, it applies more emphatically to private associations, especially, when the contract has been ratified, not only by those immediately authorized to conduct the business of the Company; but when the recognition and adoption of it has been brought home to every individual interested in the association.

In this case, no payment had been made by the company to *White, Taylor* and *White*, so that they had not accepted of their engagements, but assessments had been ordered by them ; and it is in vain to pretend, that the procuring of the machinery would not have proved beneficial and necessary to conduct the business of the association. It was evident- ly a measure indispensable in the creation of the establish- ment, according to the intent and meaning of the articles of association ; and it will not admit of a moment's doubt, but that it was so treated and considered by all the persons concerned in the undertaking, at the time the contract was entered into, and immediately thereafter. To suffer those persons, therefore, to stand by and encourage the appellant to make the agreement, and by their subsequent conduct to recognize and adopt it, and, afterwards, on finding the

IN ERROR.
........
ALBANY,
February,1822

SKINNER
v.
DAYTON.

concern to be a losing business, to shield themselves from responsibility, under the pretence of want of authority to make the contract, and thus throw the responsibility on the the appellant exclusively, with ruinous damages, seems to me to be an act of injustice not to be tolerated. On the contrary, it presents a case, in my view, peculiarly requiring the interposition of a Court of Equity, in securing to the party a right to look to the credit of the individual members ; because, they must be deemed, by their own acts, to have ratified the covenant or contract, and, of course, in making themselves parties to it, rendered themselves personally liable with the appellant, in proportion to their interest. If this be correct, it is evident, that none of the members, thus circumstanced, could shelter themselves under the sixth article of the association by a forfeiture of shares, and by those indirect means avoid the performance of a contract to which they had before voluntarily (at least in a Court of Equity) made themselves parties. If this article should receive the exposition contended for by the respondents, a door would be open for the practice of frauds on innocent strangers ; for it must readily be perceived, that co-partners for conducting business of this description could, at all times, so arrange their concerns as to reap the profits of the establishment at the sole risk of their creditors.

My opinion, accordingly, is, that, with regard to the first decretal order, as between the appellant and the respondents, *John White, Randolph Taylor* and *Marvin White,* the master be directed to inquire and report only as to their actual losses and expenditures, as far as they had proceeded in complying with the contract; that the injunction with regard to the judgment in the suit at law, in which *John White, Randolph Taylor* and *Marvin White* are plaintiffs, and *Reuben Skinner,* defendant, be continued, until the question as to contribution between the appellant and the respondents is finally decided and ascertained. That the last decretal order as between the appellant and *all* the other respondents, be reversed, with directions to the Court of Chancery to enter a decree declaring all the respondents, except *Nathan Doan,* liable individually to contribute rateably in the pay-

ment of the damages, which may ultimately be recovered from the appellant, in consequence of the abandonment of the contract with *White, Taylor* and *White* for machinery; and as respects *Nathan Doane,* that the bill be dismissed, and that he be paid the costs incurred in the Court below.

IN ERROR.
••••••••
ALBANY,
February, 1822.

SKINNER
v.
DAYTON.

WOODWORTH J. concurred.

VAN NESS, J. was of opinion that the decree of the Court of Chancery ought to be affirmed, and stated his reasons.

SPENCER, Ch. J. I cannot think that the question whether the appellant is bound at law, to respond to *W. T. & W.* because he has entered into a covenant under seal, admitting that he had authority from the *Granville Cotton Manufacturing Company* to make the contract, has been decided either in the Supreme Court, or in this court, on the former appeal. The appellant never availed himself of the permission given by the Supreme Court to amend his plea, by setting forth his authority from the company to contract with *W. T. & W.* He saw fit to seek relief in equity; and when the case came before this court, on the former occasion, it was from an appeal dissolving the injunction; and the argument proceeded on the bill and answer only. All the parties are now before the court; and it is not material to inquire, what would be the strict principle of law, as between the appellant and *W. T. & W.* The question now is, whether the appellant, admitting him to be eventually responsible on his covenant to *W. T. & W.,* is not, as between himself and the other respondents, entitled to call on them to contribute towards the payment of such damages, as *W. T. & W.* are entitled to recover by virtue of their contract, and whether all, or some only, of the respondents, are liable to such contribution.

I take it to be clearly proved, that the appellant, who together with *William Raymond, jun.* and *Abner P. Hitchcock* were the directors and agents of the company, (which is a private unincorporated association) made the contract with *W. T. & W.* with the direct approbation and consent

IN ERROR.
........
ALBANY,
February, 1822.
~~~~~
SKINNER
V.
DAYTON.

of *Wm. Raymond, jun.* and that it was subsequently made known, assented to, and ratified by *A. P. Hitchcock*, the other director, *Ira Hall, Abraham Dayton, Reuben Wheeler* and *Nathan H. Raymond.* Indeed, all the respondents, except *Nathan Doane*, have assented to and ratified this contract, either by being present and concurring in the assessment made the 27th of *April*, 1815, for the express purpose of raising moneys to meet the engagement entered into by the contract of the 25th of *April*, 1815, between the appellant, in behalf of the directors, and *W. T. & W.*, or by payments on that assessment, with a full knowledge of the purpose and object of the call and assessment.

Both at law and in equity, the subsequent assent of the principal to the act of an agent, in relation to the interest and affairs of the principal, is equivalent to a positive and direct authorization to do the act. Such subsequent assent is an adoption of the act of the agent, with a view to reap the benefit flowing from it; and he who receives the advantages and profit of a contract, must assume the risk of the disadvantage and loss which may attend it.

There would be no difficulty in coming to the conclusion, that all the members of the association who ratified the contract, were bound to abide the advantages and loss attending it, but for the terms of the association. The associates were partners, as regarded each other, and as regarded the public, who dealt with them and trusted them. Their respective liabilities to each other, and to third persons ignorant of the terms of their association, may, undoubtedly, be different. In the latter case, they would be liable without reference to their private rules, but in the former case, their own rules would be binding as among themselves.

It has been strongly insisted on, that the only remedy which one of the members of the association can have against another, is by a forfeiture of the shares held by such member. The sixth article of the constitution, or association, is as follows : " Each person shall at the time of sub-" scribing for stock, pay in cash, on every share by him or " her subscribed, ten dollars, and shall, from time to time, " and at all times thereafter, pay such assessments as shall " be made by the president and directors, or forfeit such

" share or shares with all previous payments made thereon." The Chancellor was of opinion that the appellant was not entitled to charge the other members of the association individually, with any part of the damages for which he was liable under the contract to *W. T. & W.* He held, that the company could not be bound, beyond the capital paid in, and that the president and directors had no power, under the articles, to bind the members individually ; and that whoever dealt with the company, as such, and without resorting to a personal covenant, was to be presumed to deal with them according to the terms of their constitution ; and to give the credit to the funds of the company actually paid in, or to be paid in under assessments duly made ; and that he had no right to look to the credit of the individual members, unless those individual members entered into a personal covenant or contract. He considered the sixth article as a check to extravagance and abuse in the management of the company concerns, and that every member reserved to himself the right to withdraw from further responsibility, by refusing to pay any more assessments, under the penalty of a forfeiture of his shares and of all previous payments made thereon. He was of opinion that the assessment of the 27th of *April,* 1815, implied no other obligation than to pay it, or submit to the forfeiture ; that an assent to the assessment was no ratification of the contract, and that the other respondents were not chargeable with any breach of faith in refusing to pay it, and submitting to the penalty ; and that neither the appellant nor *W. T.* & *W.* could complain of any surprize or imposition, by such refusal, for they were subscribers to the articles of association, and knew the tenor of it.

It seems to me, with all deference, that the opinion of the Chancellor goes to the subversion of all claim or demand for compensation by *W. T. & W.* for the non fulfilment of the contract with the appellant ; unless we are prepared to say, that the contract ought to be considered a personal covenant on the part of the appellant. It appears to me impossible that it should so be considered by a Court of Equity. *W. T.* & *W.* being subscribers to the articles of association, and knowing the tenor of it, knew as well as the

appellant, whether he could bind the association by his contract. This case is entirely distinguishable from the one where a stranger is dealing with an agent who professes to have power to bind his principal, when he has no such authority. In that case, if the agent exceeds his power, he shall be personally bound; otherwise, the party dealing with him, and ignorant of his defect of power, would be defrauded; but when the knowledge of the contracting parties is the same, when the defect of power is known to both, if the person assuming to be an agent, acts in that capacity, but, from defect of power, does not bind the principal, in such case the other party cannot impute fraud to him; and, in the language of the Chancellor, " cannot complain of surprise or imposition."

No man can read the agreement between the appellant and *W. T.* and *W.* without seeing, in every sentence of it, the complete sense of the parties, that the appellant was contracting as agent, for the sole benefit of the company; and that he did not mean, nor could *W. T.* and *W.* understand him to mean, to be personally bound. The agreement professes to be made by *Skinner, Raymond* and *Hitchcock,* as directors. They engage, in behalf of the company, to pay *W. T.* and *W.* the price stipulated for the machinery. They, as directors, engage to pay the balance due on the first six frames, when put in operation; *and the company further engage,* to procure drums and belts for the machinery. The appellant alone signs and seals for the directors; and, by way of postscript, the *company engage* to transport the machinery at fifty cents per hundred weight. Now we perceive that at one time, the directors engage in behalf the company; at another, for themselves as directors; and in other parts of the agreement, the company engage; thus demonstrating, that the agreement and engagement regarded a performance by the company alone. We perceive, that the whole amount to be paid to *W. T.* and *W.,* was $15,120. Is it possible to believe, that they looked to the individual responsibility of the appellant? Did they not know that he was not to pay any thing beyond the amount of his subscription? Did they not know that the stockholders were to pay rateably?

But it has been strongly contended, that the appellant had not power to bind the company by this contract : I do not now mean as to their responsibility beyond voluntary payments upon calls, but that he had no authority to contract at all. The fact has already been stated, that the associates elected the appellant, as president, and *William Raymond*, jun. and *Abraham P. Hitchcock*, as directors. Now, *under the 4th article of the association, it is declared to be the duty of the president and directors,* to appoint a general agent, whose duty it shall be to purchase stock and vend the goods of the company, *and under the particular direction of the president and directors to transact all such business as they shall deem best calculated to advance the interest of the company.* This virtually vests the power of transacting all necessary business in the president and directors ; for if they could direct an agent to transact it, no agent having been appointed, they could themselves transact all necessary business. A power to direct the thing to be done, implies a power in the persons authorized to give directions to do the thing themselves. Why were these appointments made, unless it was intended, that the president and directors should act ? How was the object of the association to be attained, but through the agency of the president and directors ? They, undoubtedly, had authority to make contracts, or else the associates were never in earnest in the avowal of their intention to put in operation a cotton factory. It is not necessary to discuss the question, whether the president and one director could legally bind the company, without the concurrence of the other director, because the proof is clear and unanswerable, that *Wm. Raymond,* jun. did assent to the contract at the time, and that both he and *A. P. Hitchcock,* fully approved it, two days after it was made, by voting for an assessment to meet the payments stipulated in the contract. They were, therefore, bound; and all the associates, excepting *Doane,* who was not present at the meeting on the 27th of *April,* were bound by the contract, unless their responsibilities were limited to a forfeiture of their stock and previous payments.

This case, then, cannot be distinguished from that of *Randall* v. *Van Vechten and others.* (19 *Johns. Rep.* 60.) That,

also, was upon a contract under the hands and seals of the defendants, and they stipulated to pay the sums mentioned in the body of the agreement. They were styled, in the agreement, a committee appointed by the corporation of *Albany* for that purpose; but they signed and affixed their individual seals to it. The principal question in the case was, whether it was a personal covenant, binding the defendants individually, or whether it was a contract which bound the corporation. The Supreme Court held, that when a person assumed to contract as an agent for an individual or a corporation, he must see to it, that the principal was legally bound by his act; for if he does not give a right of action against his principal, the law held him personally liable. It was there said, that the defendant contracted in the character of agent for the corporation, in relation to a subject exclusively appertaining to the corporation, and that they were not bound, unless the nature and form of the contract was such as to create no liability on the part of the corporation, and that it was incumbent on the defendants, in order to excuse themselves from personal responsibility, to show that the plaintiff had a legal remedy against the corporation. From the facts in the case, the Court was of opinion, that the plaintiff there had a remedy, by an action of *assumpsit*, against the corporation: and particular stress was laid on the fact, that the corporation had recognised, adopted and ratified the contract, by a variety of acts in reference to it. It was held, that the corporation was not absolved, because their agents had entered into a sealed contract, and that the sealing of the contract by the agents did not alter the question. The same principle was decided by the Supreme Court of the *United States*, in the case of *Bank of Columbia* v. *Patterson's administrators.* (*7 Cranch*, 297.)

There is a striking analogy between these cases. Here the appellant contracted, in the character of an agent for the company, and in relation to a subject emphatically theirs, with a joint interest of his own. Whether they were liable, *eo instanti*, is not made the test. They were liable, before the arrival of the time for the fulfilment of the contract ; and in that case, as here, their liability was evinced by their ra-

tification and adoptoin of the contract. The variance in an important fact, between the cases, would vary also the conclusion on another point. Admitting, for the present, that the company were bound no further than they individually chose to comply with the assessment; it may then be said that the appellant is bound. because he has not shown that *W. T.* and *W.* have a legal remedy against the company. But the important difference between the cases is this, *Randall* was not a member of the corporation ; he knew nothing of their resolutions until after the contract was entered into ; but, *W. T.* and *W.* were members of this company ; they knew, or were bound to know, if the case be so, that they would not be bound personally, or in any other way than by calls and assessments. The appellant then has shown that *W. T.* and *W.* have every legal remedy on the contract, which was within the contemplation of the parties. The appellant has bound them by their subsequent ratification, as fully as they could be bound by the terms of their association : and if they are not so bound, as to be responsible fully to indemnify *W. T.* and *W.* for the losses they have sustained, it is not because the appellant had not power to bind or to contract for them, but because, from the nature of the association, it was optional whether they would be bound or not. This risk and contingency *W. T.* and *W.* must be deemed to have contemplated. If the contract, or articles of association, were susceptible of this construction, it appears to me, that such would be the consequence ; and that the appellant would not be holden personally, he having acted in good faith, and *W. T.* and *W.* being fully apprised of all the facts, and acquainted with the articles of association.

But I cannot yield my assent to the principle, that such of the respondents as ratified, adopted and confirmed the contract, between the appellant and *W. T.* and *W.* are not responsible in their individual persons or property ; nor can I assent to the position, that, under the 6th article of the association, those who have thus ratified the contract in question, have a right to withdraw themselves from further responsibility, by refusing to pay any further assessments, and by a mere forfeiture of their shares and the previous payments.

IN ERROR
.......
ALBANY,
February, 1822.

SKINNER
v
DAYTON.

The object of the association was to manufacture cotton yarn and cloth; they were, consequently, to procure a site for a factory, to procure machinery to purchase the raw material, employ workmen, and do every thing necessary to the accomplishment of the object. I have already shown, that under the 4th article of the constitution of the company, the president and directors *had the power to transact all such business*, as they should deem best calculated to advance the interest of the company. They had the power to make assessments; and the 9th article provides, *that the president and directors shall give the stockholders of the company thirty days notice of any assessment made and payment required.* Would it be a fair and natural construction of their powers; would it comport with the interests of the concern, or can it be presumed to have been the intention of the parties, that no engagement should be entered into, nothing undertaken or done, until the calls had been made, and the money actually in the hands of the treasurer? I think not; and the acts of the respondents show they had no such meaning. It is in evidence, that when the assessment of the 27th of *April*, 1815, was made, it was fully stated that it was made to meet the payments which would fall due under the contract with *W. T.* and *W.* This, then, was an express recognition of the right of the president and directors to make contracts, stipulating for future payment; and it was a practical construction of the terms of the association. But the president and directors were, by the 4th article, authorized *to transact all such business as they should deem best calculated to advance the interest of the company.* This was a plenary power to enter into contracts, and to incur debts, to promote, according their best discretion, the interests of the association. Can it then be contended, that it was the intention of the company that their confidential agents should assume responsibilities, and pledge their private fortunes, whilst the other members of the association should be at liberty, if they thought it for their interest, to retire and throw the whole charge upon their agents, with no other loss than the forfeiture of their shares, and the payments made? In the commencement of the business, and when heavy expenditures were necessary, they could thus

retire with almost perfect impunity. The mere statement of the pretension seems to me to show its unreasonbleness ; and, I think, we ought not to construe the 6th article of the compact in a manner which would produce such unjust consequences. We must regard the end and object of the association, and all its provisions, in order to ascertain the real intention of the 6th article. I have already stated, that *it binds the associates to pay the assessments made by the president and directors, or to forfeit each share or shares, with all previous payments made thereon.* It may well be questioned, whether the right of forfeiture is not one vested in the president and directors, to be enforced, when one of the company shall neglect or refuse compliance with the assessments and calls. I much doubt, whether it is a right vested in the individual ; but, admitting it to be so, good faith requires, and there is nothing in this article that forbids such construction, that the right should be exercised, and an election should be made, *in limine.* It is too late to resort to it, after the stockholders have assented to a contract made in their behalf, and which imposes a heavy personal responsibility on their agents. If this particular contract with *W. T.* and *W.* had been repudiated, on the 27th of *April,* two days after it was made, the appellant might have exonerated himself, by procuring it to be rescinded ; or had *W. T.* and *W.* been immediately informed that the stockholders were dissatisfied with it, and meant to avail themselves of their right to forfeit their shares, they would probably have desisted from carrying it into execution. On the contrary, the assessments were laid, and the calls made without any opposition, and with the express assent of all the stockholders, except *Doane* ; and thus the appellant and *W. T.* and *W.* were lulled into security, and thrown off their guard. They had a right to believe, and to act on that belief, that the assessments would be paid. It is a principle of equity, that, when a man is bound to speak, and by his silence contributes to a fraud, he shall be compelled to repair the mischief his fraudulent silence has occasioned. (1 *Mad. Ch.* 210, 211.) This principle is directly applicable to this view of the case; and I should consider it a fraud on the appellant.

d *W.T.* and *W.* for the stockholders to be silent, when provi-

IN ERROR.
........
ALBANY,
February, 1822.

SKINNER
v.
DAYTON.

sion was making for the fulfilment of the contract, with respect to their determination to forfeit their shares, and thus prevent its being rescinded ; and afterwards, when the mischie had happened, to interpose their right of forfeiture. Common honesty, as well as equity, forbids such a course.

My conclusion is, that, although *W. T.* and *W.* would not have any remedy against the appellant, solely, they have a good ground of action against the individuals composing the association, excepting *Doane ;* and the parties being all before the court, there is no difficulty in applying the remedy, by directing a contribution, rateably, in proportion to the shares held by the respondents respectively, for the payment of the sum justly due to *W. T.* and *W.* under the contract with the appellant.

Much stress has been laid on the fact, that the appellant refused to pay the assessments on his shares. He had the same right to refuse as the other respondents ; but this has nothing to do with the question, whether those who thus refused, are not now bound to contribute ; nor has it any bearing on the question, whether the appellant acted as the agent of the company in making the contract with *W T.* and *W.*, nor whether that contract was afterwards adopted and ratified by the company. I have not thought it necessary to refer to the evidence showing that adoption and ratification ; this has been already sufficiently shown.

S. M. HOPKINS, *Senator.* If the decree of this court, on the former appeal from the order of the court of Chancery, dissolving the injunction, is to be considered as finally settling 'the right to damages, it is difficult to understand, and the case does not inform us, why the parties, afterwards, on filing a replication, have examined witnesses and gone into a hearing in the Court of Chancery, *upon the the merits at large.* That course, however, has been taken, and I do not see that the propriety of it has been questioned. On the hearing, the Chancellor, intending to conform to the directions of this court, has ordered a reference to a master, to ascertain the compenation or damages which *W. T.* and *W.* should recover ; and as to the other respondents, he has decreed that they are not bound to *contribute.*

It does not appear, that *W.*  *T.* and *W.* were advised, that in defending the bill, they could plead or insist upon the judgment of the Supreme Court on the demurrer, as concluding the rights of the parties, as to the subject matters of the bill, or any part of it, nor upon the pendency of that suit, as a dilatory plea. But it has been insisted on, in argument, that the appellant's individual liability has been finally adjudicated by the Supreme Court, on the demurrer, and that he cannot now be allowed to set up a defence which he has, or might have, availed himself of in that court; and it has been suggested, though not strongly contended, that the former decree of this court concluded the question. The cases cited in support of that position are clearly distinguishable from the present case. Here, the suit in the Supreme Court was not decided on the merits; but left open for the admission of further facts: and the plaintiff elected to state those facts in a bill in Chancery, introducing new parties, and seeking a remedy for himself, and stating the authority by which he executed the contract, &c. It does not follow, that because this court, on the former appeal, retained the injunction, and directed a judgment to be confessed, in the suit at law, that they, therefore, decided the main question. The direction given might be proper, as a precautionary and preparatory measure towards the final decision of the controversy. Even if the court, in a previous stage of the cause, had intimated an opinion, it would not be conclusive. No final judgment or decree has been given ; the cause is now open on its whole merits ; and this court is at liberty to examine it, from its foundation.

The parties to this bill, or those whom they represent, formed a limited and qualified co-partnership, the articles of which are set forth in the case. The business was to be conducted by officers, under the particular direction of the president and directors, all of whom were chosen by the stockholders. The president and directors were authorized to lay assessments upon the stockholders, which were to be paid, under the pain of forfeiture, and the shares were transferrable. On the plain meaning of this instrument, it is impossible to doubt, or that the subscription to it imported no *personal* obligation, either upon the original stockholders

IN ERROR.
........

ALBANY,
February, 1822.

SKINNER
v.
DAYTON

IN ERROR.

........

A.... N Y,
February, 1822.

SKINNER
v.
DAYTON.

or the transferees, to pay up the assessments, and that the forfeiture of the shares was the only remedy for non-payment. The respondents, *W. T.* and *W.* subscribed two shares, and the appellant and the other original parties subscribed the residue of the stock, or eighteen shares. The inartificial and inaccurate contract of the 25th of *April,* 1815, was executed. The introductory part of this contract states it to be entered into between the appellant, *W. R. jun.* and *A. P. H.* " *as directors* of the *Granville Manufacturing Company,*" and *W. T.* and *W.* The object of the contract is machinery for the manufactory. In a subsequent clause, the appellant and the other two directors named, " engage in behalf of the said company, to pay, " &c. And again, " the said directors engage to pay the balance when the frames are in operation." " And the said company further engage to procure drums and belts," &c. And in the conclusion, it is said, '· the parties have set their hands and seals." And it is executed, in behalf of the company, thus : " *For the directors, Reuben Skinner,* " (L. S )

The first and cardinal rule in the construction of contracts, and that to which all other rules are subservient, is to construe them according to the real intent of the parties. This rule is only to be departed from when the particular intent would interfere with some great and salutary rule of public policy, the breach of which would be a greater evil than the individual wrong. In this case, no such general controling principle interferes with the particular intent. What, then, was the real meaning of the parties ? It is imposible to read the contract, and doubt, for a moment, but that all parties supposed that credit was given to the *Granville Manufacturing Company,* in their collective and abstract capacity, *as a company,* and not as individuals. Is it possible to believe that the appellant, when he executed the contract, " for the directors," imagined that he was signing it, for no person but himself, or that *W. T.* and *W.* so understood it ? In saying this, I lay out of view all the *parol* proof of intent, as inadmissible, both in equity and at law. What inflexible rule of public policy, then, is there which compels us to construe this contract directly contrary to the intention of the parties ? I know of none, unless it be

found in the judgment of the Supreme Court, on the demurrer between the original parties. (13 *Johns. Rep.* 307.) It is there decided, as I understand the case, that a person who enters into a contract in the name of another, and as the agent of another, is personally responsible to the persons with whom he contracts, if from a defect of authority, the principal is not bound. That a person pretending to act under a power of attorney may be so answerable, in some cases, I freely admit; but the rule as laid down by the Supreme Court appears to me too general. It ought to be limited to the case, *first*, of *fraud* in the agent, or such misconduct as is equivalent to fraud; and *second*, to the case of a personal engagement that the principal shall ratify. The position which I question, and shall proceed to examine, is this : " that an agent is universally answerable for the sufficiency of his powers, though he be free from all imputation of fraud, and though he has interposed no personal engagement." The cases cited in support of this position, are, *Yelv.* 127. 2 *Vern.* 127. 3 *P. Wms.* 277. 1 *Fonbl.* 287. *note.* *Poth. on Oblig.* n. 448. 4 *Burr.* 2108. 3 *Johns. Cas.* 70. 5 *East*, 148. 4 *Mass. Rep.* 595. None of the English cases; and but one *dictum*, and that not a judicial one, is applicable to this point. The case in 2 *Vernon*, was that of an attorney at law, who received from an insolvent debtor, in behalf of his client, a *composition* for a debt, saying, that he had no authority, but engaging that his client should agree to it, and give up the bonds. The case in 3 *P. Wms.* contains merely an *obiter dictum* of Lord *Talbot*, who puts the doctrine on the ground of fraud ; and *Fonblanque* makes a very loose and general remark upon the opinion of Lord *Talbot.* He does not define what sort of an attorney or agent, or how constituted, or in whose favour the liability of the agent attaches. He may mean a liability of an attorney to his constituent, which is not the present case. In 4 *Burr.* the action was by a client against his attorney, for mismanagement. It is unnecessary to examine other cases decided on a different principle ; for it is very distinguishable, when an attorney does not act or contract in the name of his principal, nor affect to bind him ; but binds himself that his principal shall do a particular act. Such was the case of *Tippets* v. *Walker and*

IN ERROR.

ALBANY,
February, 1822

SKINNER
v
DAYTON.

IN ERROR.

. . . . . . .

ALBANY,
February, 1822.

SKINNER
v
DAYTON.

*others*, (4 *Mass. Rep.* 599.) which has been relied upon, as perfectly analogous to the present. The defendants, in the beginning of the contract, *describe* themselves as a committee appointed by the directors of the *Middlesex Turnpike Corporation* : This is a mere *descriptio personarum*, and the committee agree to make the several payments there mentioned to the plaintiff. In no part of the contract do they engage *for* the directors or the company ; nor do they sign and seal *for* their principal. In the contract in the present case, the word " company" is twice used. " The company engage," &c. This shows what is meant by the word " directors," used in another place ; and the plaintiff signs and seals " *for* the directors." The case in *Yelverton* was that of a servant, who wrote thus : "Memorandum, that I have " received to the use of my master, fifty pounds, to be paid next *Michaelmas*." The servant was held liable, because it was uncertain who was to pay. But, if, says the case, he had expressed it, " to be repaid by my master, it would have been different." This observation strictly applies to the present case, where the words are, " the company engage." In the case, in 4 *Burr.* the court looked much to the question, whether the attorney *knew* that he exceeded his powers ; and this, too, where he was sued by his client. *A fortiori*, they would not have held him liable to a *third person*, where the knowledge of both was the same ; so that neither this case, nor that in *Yelverton*, supports the position for which it was cited ; but even if the principal point decided in *Yelverton* were contrary to the doctrine for which I contend, it is directly contrary to the rule of the civil law, as cited in *Livermore on Agency* vol. 2. p. 274.

The principle which I am examining is not of a technical or local character, but depends on a right application of human reason to human affairs, generally. It is a case of very frequent occurrence. If it were correct, therefore, it would be found in the codes of all civilized nations. It is not in the *Civil* or *French* law. It is not laid down as a principle of the *English* law, by *Blackstone, Viner*, or *Comyns*. Mr. *Chitty*, in his *Treatise on Pleadings*, p. 24., in deducing a rule from the case in 3 *P. Wms.*, states the principle, with so much less latitude, as manifestly to show his distrust of that case. In the treatise of Mr. *Liver*

IN ERROR.
........
ALBANY,
February, 1822.

SKINNER
v.
DAYTON.

*more*, to which I have referred, he states the doctrine in general terms, manifestly, however, as derived from the case of *Dusenbury* v. *Ellis* (3 *Johns. Cases*, 70.) That case came before the Supreme Court, on a *certiorari* directed to a Justice's Court : And it is to be remarked, that the urisdiction of these inferior courts is of a mixed and peculiar character, and of a very limited extent. Questions brought up from those courts are seldom much discussed, and the decision upon them can hardly be considered as of more authority than that of a judge at *nisi prius*. In that case, the defendant made a promissory note beginning, " I promise to pay," and signed thus, " for *Peter Sharpe, G. D.*" In point of fact, the defendant had only a general power to collect debts. The Court, in giving judgment for the defendant, said, that the party who accepts a note under such a mistake or imposition ought to have the same remedy against the attorney as against the principal. But what were the facts in that case ? Did the court proceed on the ground of a *mistake*, or of *imposition ?* For there is a wide difference between them. Or did they ground their decision upon the fact, that the principal was in a foreign country, which would constitute a case entirely different in principle ? Was the note, so trifling in amount, given for a person in a foreign country, for goods purchased, or money borrowed by the agent for him ? Was it not rather a mere settlement of accounts? If so, it is obvious that injustice was done, as it always will be done, when the decision in that case is followed.

I have thus shown on what ground, in point of authority, the decision of the Supreme Court, on the demurrer in the present case, rests; and I think that I may safely conclude, that there is no precedent or authority to support the position, that an agent acting under defective powers, or beyond his powers, is personally liable therefor, to the person with whom he contracts, if the mistake is mutual, or if the agent acts *bona fide*, or if there is no special engagement on his part.

Next, let us test the doctrine, as to principle, and by its application to different cases. In *Nixon* v. *Hyserott*, (5 *Johns. Rep.* 58.) it was decided, that an attorney who was authorized by a regular power to sell land, had not thereby au-

thority to enter into covenants of warranty, &c. in the deed, which he should execute to the purchaser. Suppose, that, at the time of executing a conveyance with such covenants, he had produced his power to the purchaser, or that it was recorded, or that the grantee, in any way, knew as much of the power, or was chargeable with as much knowledge, of it, as, the attorney, and that there was no fraud, practice, or concealment by the attorney, would it not be a case of mutual error, in which the attorney would not be liable? Again; to test the doctrine by the rules of pleading: the action is brought directly against the agent or attorney, alleging that *he* covenanted, &c. The deed, in the usual form, would be expressed to be made " between *A. B.* of the first part, by *C. D.* his attorney, and *E. F.* of the second part; and the covenant would be by the *said party* of the first part. How, then, could a declaration be drawn so as to charge the attorney? If drawn in the usual form, the plaintiff must fail, on the general issue. And I know of no precedent of a special declaration on the covenant in such a case, nor has any been shown.

*Vide Ante*, p.
60.
The case of *Randall* v. *Van Vechten*,* decided in *May* term last, shows, that even if the defendant puts his own hand and seal, and with express words of personal engagement, the covenant does not necessarily bind him. The court, in that case, resting on extrinsic circumstances, determined that the instrument was no deed, but merely evidence against the corporation of the city of *Albany*. That is a much stronger case than the present, in favour of the defendant. The court, however, put it on the ground, that an action was furnished against the corporation. It is not my duty to examine that ground; and I cite the case merely to show that sealing and delivery, and express words of personal engagement by the agent, do not, of necessity, import personal obligation.

It comes, then, to this, that if the agent has been guilty of fraud, the common principles of law and equity, and the remedies founded on them, will reach him. If he specially engaged that his principal should ratify his act, as in the case in *Vernon*, the same remark will apply: an action or

bill adapted to the case, will be the proper course of pro-
ceeding.

Neither fraud nor contract can be presumed; they must
be specially alleged and put in issue. They constitute the
*gist* of the action, and no conclusion against the agent can
follow, until one or the other is affirmatively established. It
would seem to me, that any other construction would tend to
confound innocence with guilt, fraud with candour, and to
break down the distinction between right and wrong. The
analogy of the whole law is opposed to the principle of
making a man answerable for an innocent mistake, whether
of law or fact, or of presuming a fraud, unless it be charged
against him, and proved. In no part of the proceedings, in
the present case, before the court, do *W. T. & W.* charge
the appellant *S.* with deceiving them; and it is perfectly
manifest that they could not maintain such a charge, for they
were equally parties to, and had equal knowledge of, the
" constitution " of the company. All the parties signed at
the same time, and are all alike chargeable with notice of
who were the officers, and what were their powers. All
were equally negligent of that salutary caution and accura-
cy in the form of such an instrument, which, had they been
observed, would have saved them from great trouble and
expense, and some of them from ruin. The relation of *W.
T. & W.* as members of the company, and their privity to its
constitution, render it unnecessary to inquire what would be
the effect of a contract between the company and strangers.

It has been argued, that if *Skinner* is not personally lia-
ble, some one must be so; that if the directors or stock-
holders are not personally liable, the contract wholly fails
of effect, which would be absurd, and contrary to the plain
equity and intent ; and that, therefore, the appellant must
be liable. I deny, first, all the premises in this argument;
and, secondly, admitting the premises, I deny the conclusion.

If the members of the company are not personally bound,
*W. T. & W.* may have a defective or void security. That
is a misfortune which daily happens to other men. If the
contract is not what the parties intended it should be, it does
not, therefore, follow, that it is some other and different
thing which they did not intend. But, in my opinion, the

IN ERROR.

ALBANY,
February, 1822.

SKINNER
v.
DAYTON.

IN ERROR.
........
ALBANY,
February, 1822.

SKINNER
v.
DAYTON.

contract, though very inartificially drawn, is a good and va‑ lid contract for all the purposes actually intended by the parties ; and ought to be carried into execution, as far as it may be, according to that intent. It conferred mutual rights, though it was not, perhaps, precise or equal in its terms. By the " constitution " of the company, it is made the du‑ ty of the president and directors, " to appoint a general agent, whose duty it shall be to purchase," &c. " and, under the particular direction of the president and di‑ rectors, to transact all such business as they shall deem best," &c. They, therefore, are to judge what business is to be done, and it is to be done under their particular directions. Now, if *R. S.* entered into this contract, with the approba‑ tion and consent of the directors, that is a sufficient appoint‑ ment of him as agent for the time. No form, election, or wri‑ ting is necessary for that purpose ; and as the agent was to do this business under the particular direction of the president and directors, I am inclined to the opinion, that they had an implied authority to do it themselves. The intervention of an agent was only for their own ease and relief.

On the 20th of *May*, the president and both the directors wrote a letter to *W. T. & W.*, which more fully recognises the contract as their own. They speak of the forfeiture of shares, and solicit an alteration of the contract. Their own shares were not then forfeited : at least, the thirty days were not then expired. The whole conduct of *W. T. & W.*, in relation to this letter, shows that they recognised its princi‑ ples ; otherwise, they would, at once, have replied, that they had no concern with the company ; that the forfeiture of shares did not affect them, and that they had no dealing with any‑ one but *Skinner*, the appellant. The conduct of all parties, at this period, shows that they acted upon this as a valid con‑ tract *with the company.* A more complete ratification cannot well be imagined. The ratification is equally well proved by the fact attending the first assessment, which was made on eighteen shares, only, the other two shares being subscribed by *W. T. & W.* on the special condition, connected with their contract, that they should be exempt from assessment, for a certain time. It is difficult to suppose a more decisive recognition of the contract itself, than this act of the presi‑

dent and directors, in making this assessment two days after the contract. This subsequent recognition amounts to a ratificaton—It does more : It is a fact from which *assent and participation at the time*, may be, and ought to be inferred : and when so inferred, all difficulty is removed, for no writing, nor any particular form is necessary to give the contract validity.

IN ERROR.

........

ALBANY,
February, 1822.

SKINNER
v
DAYTON.

The contract, then, was made or ratified by the proper agents of the company, and is binding, not upon the individuals, as such, but upon the company, in its collective capacity, that is upon its fund. If that fund proves too small ; if it was liable to be withheld by a forfeiture of shares, it is the misfortune of *W. T. & W.* It was to that fund that they trusted. If it proves a shadow, the law cannot give them a ubstance, for which they never stipulated.

The result of my opinion is, 1. That the appellant has a perfect defence against the action at law, not so properly under a special plea, as under the general issue : That the paper was not *his deed*, nor the deed of any one. It was an agreement of a peculiar and qualified character, like that in the case of *Randall* v. *Van Vechten and others.*

2. That, of consequence, the appellant's bill ought to have been dismissed as unnecessary.

3. That the proper remedy of *W. T.* and *W.* was by a bill in equity against the company, upon the peculiar and qualified nature of their engagement which a Court of law could not enforce, according to its intent.

4. But as this Court formerly decided to retain the bill, and the whole merits of the case being now before us, there is no reason why the rights of the parties should not now be adjusted under it : and I am, accordingly, of opinion, that the Chancellor's decretal order for taking an account of the damages, &c. be affirmed ; and that the Court of Chancery be further directed to cause an account to be taken of the real and personal property belonging to the co-partnership, and to cause the same to be sold and applied, together with any assessments of any members, who have not forfeited their shares, to the payment of the damages so found; but that the other defendants and the appellant be decreed not to be liable personally to make good the said contract, nor to respond in damages therefor; and that a per-

petual injunction be issued, to restrain the further prosecution of the suit at law, and that no costs be recovered by either party, on any of the proceedings previous to this decree.

BARSTOW, BOUCK, BOWNE, GURNEE, HASBROUCK, HUNTINGTON, JUDSON, LYNDE, MILES, MILLER, MOOERS, MORE, PAINE, ROSENCRANTZ, SEYMOUR, and TOWNSEND, *Senators*, were of opinion that the decree of the Chancellor ought to be reversed.

ADAMS, AUSTIN, FROTHINGHAM and VIELE *Senators*, concurred in the opinion of Mr. Justice VAN NESS, that the decree of the Court of Chancery ought to be affirmed.

*For reversing,
21   For affirm-
ing, 5.

A majority of the Court,* being of opinion that the decree of the Court of Chancery ought to be reversed ; it was thereupon, " ORDERED, ADJUDGED, and DECREED, That the decretal orders of the Court of Chancery, appealed from, be reversed : And it is further *ordered, adjudged,* and *decreed,* that it be referred to a master of the Court of Chancery, to ascertain and report the actual damages, if any, sustained by *White, Taylor* and *White,* on the first day of *August,* 1815, under the covenant and agreement of the 25th of *April,* 1815, set forth in the pleadings; and that the master, with a view the more precisely to estimate such damages, ascertain and report the actual and *bona fide* expenditures, in materials and labour, incurred under and in fulfilment of the said covenant, on the first day of *August,* 1815 ; the profits which *White, Taylor* and *White,* would have made on such expenditures only, and the value of *White Taylor* and *White,* in market, on that day, of the work so done, which value to be deducted from the amount of such expenditures and profits, together with interest on the balance from the 1st of *August,* 1815, shall constitute the damages recoverable on the said contract. That it be referred to a master, to take and state an account between the appellant and all the respondents, except *Nathan Doane,* who were subscribing partners in the *Granville Cotton Manufacturing Company,* and the respondents, the representatives of *Abner P. Hitchcock* and *Ira Hall* deceased, who were, also, subscribing partners in the said company respecting the es-

tate and the concerns of the said company : And, also, to ascertain the sum which such partners, respectively, ought rateably to contribute to the damages, if any, that shall be found due to *White, Taylor* and *White*. That the injunction against the judgment at law be continued, until such contributions shall have been ascertained, and until it shall be found that payment thereof, except the contribution of *White, Taylor* and *White,* cannot be enforced out of what may remain of the clear estate of the said company, or by process of execution ; in which case, the deficiency, and no more, may be directed to be levied under such judgment. That the appellant's bill, as to the respondent, *Nathan Doane,* be dismissed with costs, as to him, in the Court of Chancery, to be taxed. That neither of the parties have costs, as against each other, in this Court : And that the record be remitted to the Court of Chancery, to the end tha this decree may be executed."

IN ERROR.
·······
ALBANY,
February, 1822°

SKINNER
v.
DAYTON.

 END OF THE CASES IN ERROR.